UNITED STATES of America, Plaintiff–Appellee,

v.

Louis MANOS, Defendant–Appellant.

No. 87–1273.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 1987.

Decided June 14, 1988.

Rehearing Denied July 20, 1988.

Julius L. Echeles, Chicago, Ill., for defendant-appellant.

Mark D. Pollack, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD, COFFEY and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant–appellant Louis Manos was an inspector for the Chicago Consumer Services Department. He received bribe payments from restaurant owners subject to inspection by the Department, which led to his conviction for conducting the affairs of the Department through a pattern of racketeering, 18 U.S.C. § 1962(c),[1] and for ex-

---

1. It shall be unlawful for any person employed     by or associated with any enterprise engaged

torting monies from the restaurant owners under color of official right, 18 U.S.C. § 1951.[2] Manos seeks a reversal of the conviction, arguing that the district court abused its discretion by limiting Manos's introduction of evidence, permitting the government to introduce a witness's grand jury statement, allowing the government to improperly cross-examine the defendant, and denying Manos's request for a mid-trial continuance. Manos also argues that the government's closing argument deprived him of a fair trial. We affirm.

## I. BACKGROUND

The Chicago Consumer Services Department ensures compliance with the city's health and safety regulations, inspecting and licensing various types of businesses. Health inspectors, such as Manos, conduct the periodic inspections of already-licensed restaurants, as well as assist in the more comprehensive "Task Force" inspections of restaurants seeking an initial food-service license. Fire, electrical, plumbing, and building inspectors are also members of the Task Force teams.

During 1984 Manos received bribe money from several persons who were seeking initial food-service licenses. George Frangos, owner of Johnny's Grill, paid Manos twenty dollars on two separate occasions. Duk Yong Kim, owner of the Pear Garden Restaurant, initially paid $1,000 and later fifty dollars to Manos. Manos returned the fifty dollars to Kim ten days after he had received it. He also received $100 from the owner of the Round Robin Restaurant, Solon Gabriel.

Finally Manos helped Lieutenant Richard Dorband, the head of a Task Force inspect-

ing the Thai Town Restaurant (Manos was not a member of this particular Task Force), receive $600 from Ian Thamasucharit, the restaurant's owner. Ultimately, Manos received $150 of the Thai Town money. Sometime later Manos returned or attempted to return the Round Robin and Thai Town money he had received. Manos did not dispute that he had received money from all of these owners except Frangos; he simply argues that the payments were not bribes for him. The jury found otherwise.

## II. DISCUSSION

### A. *Evidentiary Rulings*

#### *Standard of Review*

"[A] reviewing court gives special deference to the evidentiary rulings of the trial court. We shall only overrule such rulings on a showing that the trial court has abused its discretion." *United States v. Kaden*, 819 F.2d 813, 818 (7th Cir.1987). "Appellate review of a district court's discretion is very limited. Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court. If reasonable persons could differ, no abuse of discretion can be found." *Harrington v. DeVito*, 656 F.2d 264, 269 (7th Cir.1981), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1621, 71 L.Ed.2d 854 (1982).

#### *"Honest" Interactions Evidence*

 Manos challenges the district court's rulings regarding Manos's attempt to introduce evidence of his honest interactions with numerous restaurant owners. Each of his two arguments is lacking. The

in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

**2.**     (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or

property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
  (b) As used in this section—
  ....
  (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
  ....
18 U.S.C. § 1951.

first is that this circuit's *United States v. Shavin*, 287 F.2d 647 (7th Cir.1961), allows the defendant to introduce legitimate transactions to negate the criminal intent component of a continuing-scheme charge. However, we need not even consider the merits of *Shavin* or its applicability to this case; the record is clear that when properly raised the district court granted Manos's request to elicit testimony regarding honest interactions. It is true that the district court initially denied the motion, however, this was in the context of Manos having not once mentioned that the evidence was to be used to refute criminal intent. Moreover, Manos did not complain when the district court characterized Manos's attempted use of the evidence quite differently, as "no different than if someone was a bank robber and alleged to have robbed a bank. The fact that he might have walked by four others and did not rob those banks is not relevant to prove whether or not he robbed the bank in question." Later in the trial when the district court graciously apologized for what it believed was its earlier misconstruing of Manos's argument, Manos's counsel candidly stated that "[i]t is my mistake for not bringing it is [sic] up in the first place, Judge." The district court did not err.

Manos's second argument is that the government's prejudicial cross-examination of Nick Karitsiotis, a witness called by Manos to testify regarding honest interactions with Manos, effectively foreclosed any opportunity to fully develop the honest interaction testimony of Karitsiotis and other witnesses that would have followed. On cross-examination the government had asked Karitsiotis if he was aware that Manos had been reprimanded on the job for falsifying time sheets and if this might change his testimony regarding Manos's honesty. Karitsiotis never directly responded to the question. According to Manos, this improper cross-examination forced him to forego calling his other witnesses because of the likely prejudice caused by the repetition of the time-sheets question-

ing with each subsequent witness. (We believe it is quite tenuous to claim that the fear of repetition of the single time-card question justifies blaming the government for the failure to call a number of honest-interactions witnesses.) The crux of Manos's argument is that "[s]pecific acts of misconduct may be inquired into only where the defendant has put his *general reputation* into issue. Here, the evidence was proffered as *character*, not reputation evidence." (Emphasis added.)

The government counters that the district court did no more than follow the express language of Rule 405 (and Rule 608) of the Federal Rules of Evidence. Rule 405(a) sets out the methods of proving character, once "evidence of character or a trait of character of a person is admissible." Rule 405(b) allows the use of specific acts to prove character when character is "an essential element of a charge, claim, or defense." Once admissibility is established, 405(a) provides that "[o]n cross examination, inquiry is allowable into relevant specific instances of conduct."

Manos argued to the district court that the honest interaction testimony was admissible "under 404(a)(1)—character of the accused.... [H]is character—or traits of character—as to honesty is clearly admissible. I turn to 405(b), which is a change from the common law rule, and rather than simply offer reputation or opinion, I am allowed to offer specific instances of his conduct in support of the opinion of the witness." The district court agreed and admitted the testimony under Rule 405(b), finding that "honesty, in a broad sense, is an essential element of the charge."[3]

■ Overlooked in Manos's challenge to the cross-examination is Rule 405(a)'s explicit direction: questioning regarding specific instances of conduct is proper on cross-examination. Manos argues that pursuant to Rule 405(b) he was allowed to offer specific instances of conduct "in support of the *opinion* of the witness." (Em-

---

**3.** The parties do not question whether the honest interactions testimony was admissible or whether honesty was an essential element of the crime charged, so we will assume that the testimony was admissible and the trait essential.

phasis added.) Characterizing the testimony as opinion provides no help to Manos. Opinion, along with reputation, is specifically listed in Rule 405(a); therefore, it follows that both opinion and reputation witnesses are subject to cross-examination regarding specific instances of conduct. *See United States v. Williams*, 738 F.2d 172, 177 n. 7 (7th Cir.1984) (opinion witnesses may be asked if they heard about specific instances of conduct).

■ Manos also attempts to set up a meritless dichotomy between *character* and *reputation*, citing but two cases, *United States v. Park*, 525 F.2d 1279, 1284 n. 4 (5th Cir.1976); *Bryan v. United States*, 373 F.2d 403, 404 n. 1 (5th Cir.1967), in an attempt to undo the express language of the rule. In both *Park* and *Bryan* the trials preceded the 1975 effective date of the Federal Rules of Evidence, which allow testimony regarding specific instances, irrespective of the character-reputation contrast Manos attempts to make. In any event, admissible character or character traits, and not reputation, are the operative words when considering the scope of Rule 405(a). As for reputation and opinion, these are the proper methods of demonstrating character through testimony on direct examination under Rule 405(a).

■ Manos also may be attempting to draw a distinction between testimony pursuant to Rule 405(a) and testimony pursuant to 405(b), impliedly arguing that here only 405(b) applies, and because 405(b) does not expressly authorize cross-examination regarding specific instances of conduct, the cross-examination was improper. This interpretation does not find support in Rule 405's language. Subdivision (b) does not state that the cross-examination language of subdivision (a) is inoperative.[4] It does not mention anything regarding cross-ex-

amination. An interpretation that would allow cross-examination regarding specific instances when reputation or opinion is offered on direct, but not when specific acts are offered on direct, does not seem reasonable. The notes of the advisory committee on the proposed Federal Rules of Evidence suggest no such limitation and indicate that the only limitation on specific-instances testimony under Rule 405 is on direct testimony:

> The express allowance of inquiry into specific instances of conduct on cross-examination in subdivision (a) and the express allowance of it as part of a case in chief when character actually is in issue in subdivision (b) contemplate that testimony of specific instances is not generally permissible on the direct examination of an ordinary opinion to character.

Fed.R.Evid. 405 advisory committee note. In McCormick on Evidence the authors state the obvious implication of Rule 405:

> [M]ost of the arguments against opinion evidence do not apply when character is in issue. For example, the possibility that specific acts may be inquired into on cross-examination (which may prompt barring specific act evidence when character is not in issue) is hardly of concern, since the door to such evidence already is open.

E. Cleary, McCormick on Evidence § 187, at 553 (West 3d Ed.1984) (footnote omitted).

We find that Rule 405(b) does not limit the cross-examination allowed by Rule 405(a).

■ Manos does make one final argument regarding the cross-examination. He claims that the "improper cross-examination prejudicially communicated to the jury

---

4. "Technically[, when character is in issue,] Rule 405(b) is unnecessary because specific instances of conduct are relevant to prove character and Rule 402 makes all relevant evidence admissible." 22 C. Wright & K. Graham, Federal Practice and Procedure § 5267, at 603 (West 1978) (footnote omitted). Subdivision (b) does nothing more than make the common law explicit, so as to avoid any misapprehension that the common law in this area did not retain its

vitality. The justification for Rule 405(b), and moreover for the common law rule it codifies, "is that character, when truly in issue, deserves the most searching inquiry and convincing proof. Specific incidents meet that standard and are therefore admitted despite problems of collateral issues and possible surprise." *Id.* (quoting Professor Cleary's explanation to the House subcommittee) (footnote omitted).

that defendant had been dishonest—a specific act of misconduct not reasonably related to the character traits testified to by the witness—*i.e.,* 'He does his job right and never asks for anything.' " It is unreasonable for Manos to argue that dishonesty or honesty is not "reasonably related" to Karitsiotis's testimony on direct examination. Here the district court decided that specific instances of conduct were admissible under Rule 405(b) because they demonstrated the *honesty* of the defendant, which was an essential element of the crime charged. Manos has not expressly challenged this characterization in the district court or on appeal. Moreover, when arguing to the district court that specific instances of conduct are admissible, Manos argued that "my position is as to 404, his character—or traits of character—as to *honesty* is clearly admissible." (Emphasis added.) In order to clarify Manos's position the district court asked a question: "This rule, does it not say ..., that you can offer a character trait of *honesty.* This is what you are talking about, right?" (Emphasis added.) To this Manos responded, "Exactly." The court questioned Manos further:

> So he is going to have people in here who are going [sic] say they had whatever contact they had in apparently that same relationship, and they have opinions based on their personal experience that Mr. Manos is *honest* because in these instances he neither asked [for] nor received money. That is the gist of your testimony; is it not?

(Emphasis added.) Mr. Manos answered, "Yes." Manos wishes at this late date to change his characterization from one of "honesty" to one of "he does his job right and never asks for anything." Nowhere in the record has Manos raised this particular argument. It is too late for such a change. "Evidence of prior acts, whether offered under Rule 404(b) or 405(b) by the prosecution or the defense, must be sufficiently related and proximate in time to the crime charged to be relevant under Rule 403." *United States v. Barry,* 814 F.2d 1400, 1404 (9th Cir.1987). The government's cross-examination, which Manos characterizes as an attempt to show dishonesty, is

clearly related to a crime that has honesty as an essential element. Likewise, the substance of the cross-examination is not so dated as to lose its relevance. The time-card reprimand occurred in 1982, the crimes in 1984, and the trial in 1986. Moreover, Karitsiotis testified on direct to specific instances of honest conduct that occurred "two or three years" before the trial, in 1983 or 1984. All else being equal, if 1983 conduct is relevant on direct, 1982 conduct should be relevant on cross-examination. The district court did not abuse its discretion in allowing the cross-examination.

*Kim's Grand Jury Statement*

Kim testified at trial. She is not fluent in English and testified with the aid of an interpreter. During its direct examination the government read Kim's grand jury testimony and asked if she had made these statements. Kim acknowledged that she had. Apparently she stated something more than a simple "yes" to the question, and the translator may not have fully translated the extra comment. Manos interrupted the direct examination to have the remark translated; the district court denied the request. Manos claims that introduction of the statement and the failure to divulge the added remark constitute denial of a "fair trial" and the "Sixth Amendment right to confrontation."

■ Manos fails to give the full context of the examination of Kim. On direct Kim testified that it was she, and not Manos, who had first raised the subject of bribe payments. In order to impeach this testimony the government read from Kim's grand jury testimony in which she stated just the opposite, that it was Manos, and not she, who had initiated the bribe discussion. Such impeachment is entirely proper. *See* Fed.R.Evid. 801(d)(1)(A) (inconsistent prior statements given under oath with penalty of perjury are non-hearsay).

■ As for the alleged incomplete translation, the district court indicated that the translation would stand, but that, of course, Manos could probe the answer thoroughly upon cross-examination. Manos did

proceed to thoroughly cross-examine Mrs. Kim and was in no way deprived of a full opportunity to investigate the untranslated remark. Manos fails to explain why this cross-examination, the typical method for attacking the testimony of a witness called by the opposition, was deficient. We are also left to speculate what prejudice or significance, if any, the remark may have had. Certainly, this sketchy argument cannot be the basis for finding that the district court abused its discretion.

Finally, Manos very briefly argues that Kim's grand jury testimony was not her own but a government version of the events, which were foisted upon the unwitting Kim. There is no evidence in the record to suggest that this is the case, and to the contrary, the evidence shows that she carefully reviewed her statement before acknowledging that it accurately reflected her testimony. The district court's rulings during Kim's testimony did not abuse the court's discretion.

### Manos's Cross–Examination

■ Manos also claims as error the government's failure to offer proof or rebuttal following Manos's denial on cross-examination that he and Dorband had shared money on the street. Manos failed to object at trial and has waived any error, unless the error constitutes plain error. We recognize plain error if to do otherwise would result in a "miscarriage of justice." *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982). We view the "claim not in isolation, but against the entire record." *United States v. Fakhoury*, 819 F.2d 1415, 1423 (7th Cir.1987) (relying on *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985)), *cert. denied*, —— U.S. ——, 108 S.Ct. 749, 98 L.Ed. 2d 762 (1988).

During his testimony, on both direct and cross-examination, Manos testified that Dorband regularly accepted bribes from businesses subject to Task Force inspection. Dorband had testified that he had shared some of the bribe money with Ma-

nos. Therefore as the government commenced its cross-examination of Manos facts regarding bribe payments were already well-developed in the record. Under these circumstances it is not improper to inquire of Manos whether or not he shared bribe money with Dorband on the street. The government questioned Manos in an attempt to elicit his basis of knowledge regarding the bribes Dorband received.

Manos, however, focuses on the government's trial activities after Manos's denial, particularly the failure to offer proof, but he has not indicated why the government must offer proof regarding the substance of the denied question. Manos does cite one Seventh Circuit case to support his argument, *United States v. Bohle*, 445 F.2d 54 (7th Cir.1971). In *Bohle* this court concluded that a party who lays a foundation of a prior inconsistent statement to impeach a witness must be prepared to follow up the impeaching foundation with impeaching evidence if the witness denies the statement. *Id.* at 73. However, Manos has not claimed that the government was attempting to impeach him with the shared-money question, and the government has argued otherwise. *Bohle's* dissimilarity to the present case gives it no precedential value here. Several of the remaining cases cited by Manos, which are from other jurisdictions, likewise are clearly distinguishable. The remaining cases cited by Manos that have some relevance to the issues here do no more than state that the inferences the jury will draw from the questioning should be factually true, *see, e.g., Stewart v. United States*, 366 U.S. 1, 7, 81 S.Ct. 941, 944, 6 L.Ed.2d 84 (1961). Manos has not argued in his brief that the inference likely drawn here, that he shared money on the street with Dorband, is false. Manos has failed to show a miscarriage of justice; his argument must fail.

### B. *Continuance to Review Tapes*

■ Manos claims that the district court's denial of his request for a short recess to review twenty hours of tapes[5]

---

5. The tapes contained conversations between Dorband and Terry Mofreh, prior to the time

that Dorband became a cooperating witness. Mofreh was an inspector in the Chicago Con-

deprived him of "his due process right to a fair trial, and also violated his right to effective assistance of counsel." Manos argues that the tapes contained conversations between "corrupt inspector Mofreh" and government witness Dorband, and without reviewing the tapes it was impossible for him to cross-examine and possibly impeach the testimony of Dorband. Manos asked for a continuance during the second day of trial, stating that he had learned of the tapes the previous day. A lengthy discussion out of the presence of the jury ensued.

Apparently Dorband makes incriminating statements on tape, and he also admits all of the acts contained in the tape in a lengthy grand jury statement. The government represented to Manos that Dorband would deny none of the acts admitted in the tapes and the grand jury statement; therefore, the tapes were not admissible for impeachment purposes. The district court agreed: if Dorband's testimony was not inconsistent with statements recorded on the tapes then the tapes had no impeachment value. Of course, as Manos pointed out, it would be difficult to know if the testimony and statements on tape were inconsistent without knowing what was on the tapes.

The court ordered the government to provide Manos with the summaries of the tapes prepared by the FBI agent who reviewed the tapes nightly (the tapes were made over the course of several days). The court also noted that the grand jury statement set forth the improprieties recorded on the tapes, but if the grand jury statement failed to include any of the taped improprieties the government was to bring this to Manos's attention immediately. The government also volunteered, and the court so directed, that the FBI "counter" each of the 90–120 minute tapes to highlight the four to five minutes of each tape in which Dorband actually appeared. Further, the

district court suggested that Manos review the tapes or related materials overnight and the next morning until 11:00 a.m., the starting time of that day's court session.

Before trial resumed the next morning, the government informed the court that it had isolated all portions of the tape referring to Dorband, about 90–120 minutes of recorded conversations. The government also tendered summaries of the conversations to Manos. Dorband testified on direct in the morning and the court offered to recess for the remainder of the day to allow Manos to prepare for cross-examination of Dorband. Manos declined this recess offer and several other similar offers made by the court, indicating that listening to the tapes was an "exploratory exercise." Manos complains that he should have been granted a "short recess" in addition to the time available overnight. He does not mention the district court's offer of a recess for the entire afternoon and why this does not satisfy his "short recess" request.

Putting to one side any arguments that the tapes may not have been discoverable, we cannot see how the district court abused its discretion, the governing standard when reviewing an evidentiary ruling such as this.

A motion for a continuance is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of that discretion. This issue must be decided on a case by case basis in the light of the circumstances presented, particularly the reasons for continuance presented to the trial court at the time the request is denied.

*United States v. Uptain*, 531 F.2d 1281, 1285–86 (5th Cir.1976) (citations omitted); *accord United States v. Miller*, 573 F.2d 388, 394 (7th Cir.1978). Accommodations were made to give Manos an opportunity to determine what the tapes contained. Dor-

---

sumer Services Department who was the subject of an investigation by the Federal Bureau of Investigation regarding corruption in the Department. Mofreh agreed to cooperate with the FBI, which led to his wearing of a microphone. The FBI recorded conversations he had with

corrupt inspectors in the Department, including Dorband. This activity produced the approximately twenty hours of tapes that are at issue. Recordings involving Dorband are only a small portion of the twenty hours of tape time.

band's presence on the tape was isolated, and Manos had this highlighted version. Summaries were provided.

Moreover, the court suggested it would view the necessity of reviewing the tapes differently if Dorband testified in a manner inconsistent with the tapes or grand jury statement. Manos had sufficient information to determine if such inconsistencies arose, and it is likely the court would grant a sufficient recess to review the tapes in such a case. The district court did not abuse its discretion.

### C. *Improper Closing Argument*

Manos's final argument is that the government violated due process guarantees by arguing to the jury that defense counsel raised "some bogus issues and some bogus defenses" and that the defense "is nonsense, it's fabrication and it is fantasy" and "[i]t is a tailor-made defense." Due process was also violated, complains Manos, by the government statement regarding the bribe money: "You bet it went through his hands."

*United States v. Swiatek* sets out the two-step analysis this circuit follows in reviewing claims of prosecutorial misconduct. 819 F.2d 721 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987). "First, we determine whether, considered in isolation, the challenged remark was improper. If so, we reexamine the improper remark in light of the entire record to determine whether the remark deprived the defendant of a fair trial." *Id.* at 730. As part of the second step the "invited error" doctrine must be considered. *United States v. Torres,* 809 F.2d 429, 445–46 (7th Cir.1987) (Flaum, J., concurring). Under the doctrine "we consider whether and to what extent the improper remark was provoked by the defense counsel's argument." *Swiatek,* 819 F.2d at 730.

Our reading of the record suggests that the tone and style of the closing arguments of counsel for both parties did not comport with the highest standards of attorney summation.[6] Nevertheless, labelling the statements attributable to the government prosecutorial misconduct overstates the significance of the comments. Mr. Bradley noted that "after listening to Mr. Duffy and especially the end of his argument and the histrionics and the name calling that he did, I feel it necessary to respond to these things out front." Further along he observed that "I don't know if [Mr. Duffy] was in the courtroom I was all this week." Again later on Bradley argued that "Duffy went into a lot of histrionics about Sol Gabriel and tried, I think, to deceive you both in his argument and during the presentation of this case about Sol Gabriel." Not to be outdone, Ms. Devaney offered several remarks regarding Mr. Bradley in her rebuttal:

> Now, I don't think that I can match the decibel level of Mr. Bradley, and I don't think I can match the theatrics of Mr. Bradley, but you know what? I am not even going to try because I don't have to. I can talk about the evidence in this case, something that he didn't talk about and something that he didn't deal with.

These comments were in the overall context of both the government and the defense attorneys having stated such things as the opposition had liars for witnesses, that bogus defenses were offered, and that the government was attempting to convict a defendant whose only acts were an attempt to help friends. Several times attorney Bradley called Dorband a "liar," and several times the government's attorney called the defendant Manos a "liar." Each of the attorneys seems to have been caught up in the spirit of the moment. The district court was not unaware of this. The court denied Manos's defense attorney's objection to the government's closing argument rebuttal in which the government used the "bogus issue" and "some bogus defenses" language:

> Well, Mr. Bradley, each side has argued. You personalized your argument with respect to Mr. Duffy and your argument

---

6. We note that Mr. Manos's counsel on appeal, Julius Lucius Echeles, did not represent Mr. Manos in the district court.

that he intended to deceive them. Now she is responding in kind. The jury will understand they have to decide this case on the evidence and not on any of the arguments which personalize the conduct of the parties—of the attorneys.

We agree with the district court that this tit-for-tat scenario weakens Manos's claim that improper prosecution arguments prejudiced his case, in part because his arguments invited rebuttal of the same style. However, an invited error analysis is conducted under part two of the test articulated in *Swiatek, Torres,* 809 F.2d at 445–46, and we must first complete the step one analysis, which is whether or not viewed in isolation the comments were improper, before deciding in view of the entire record whether the comments deprived Manos of a fair trial. Along with an evaluation of the prejudicial quality of the comments, it is necessary to decide whether the comments were supported by the evidence adduced at trial.[7] *United States v. Carter,* 720 F.2d 941, 970 (7th Cir.1983) ("The prosecutor may in argument suggest reasonable inferences from the evidence previously admitted.")

■ The government argument that Manos's defenses were bogus, among other things, was supported by the evidence. To put himself in a more favorable light, Manos pointed out his sixty-nine years of age and status as an armed services veteran. It simply is not inappropriate for the government to argue that such collateral facts should not bear on guilt or innocence. Manos also defended by claiming that he only meant to assist the restaurant owners in securing the necessary Task Force approval and operating licenses from safely entrenched and corrupt persons controlling the Task Force, such as Dorband. Substantial evidence demonstrates that his motives were less altruistic. Further, Manos claims his return of all of or part of the money he received is a defense to the charges here. However, this is not a legit-

imate defense because, as the district court instructed the jury, the crime was committed upon receipt of the bribe, irrespective of the ultimate disposition of the proceeds of the crime. (We have not been asked to find that the instruction was in error.) Moreover, the evidence is clear that any return of bribe money was not made until after Manos had been confronted by law enforcement officials regarding his role in securing the bribes. It follows from this that whether the government calls these defenses bogus or some other unflattering term, this characterization is supported by the evidence. Furthermore, bogus is not such an inflammatory term that, without more, it renders the term inappropriate.

■ Similarly, substantial evidence suggested Manos's testimony that he was merely helping friends, and not seeking bribes, was false. Likewise, under the facts of this case, labelling the falsity a lie or the teller of the falsity a liar does not make the reasonable inference unduly prejudicial, *United States v. Holt,* 817 F.2d 1264, 1276 n. 10 (7th Cir.1987), unless the terms are used to the point of excessiveness so that the jury's "calm and detached search for truth" is impaired, *United States v. Spain,* 536 F.2d 170, 175 (7th Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976). *Spain* held that excessive use of the liar tag skews the jury's assessment of the evidence. However, the effect on the jury is lessened, when in a case such like the one before us, the jury heard liar and the personalized attorney comments from both sides of the case. These comments seemed almost routine on the part of both parties to the point that the jury must have been dulled to any prejudicial sting that these remarks may have inflicted. Even though oft-repeated, it seems likely that the jury gave them little weight, retaining their detached approach in the search for the truth. This is especially true in light of the district

---

7. The district court upheld Manos's objection to the government's argument that in the performance of his duties as a firefighter Dorband risked his life. This was because there was no evidence from which to infer that he faced any life threatening situations in his duties with the fire department. Considered together with any other comments that are potentially prejudicial, this stricken comment could not have affected the fairness of the trial.

court's repeated admonishments that the members of the jury assess the evidence according to their own judgment and not to be influenced by any attorney characterization at odds with that assessment. Even if we assume that some prejudice resulted from the government's closing argument, which we are not, it clearly is not the type that justifies a reversal. The testimony of several restaurant owners, as did Manos's own testimony, provided a clear picture of Manos's unlawful activities. Viewing these remarks in light of the entire record, we hold that Manos was not deprived of a fair trial.

■ Mr. Manos's last argument, regarding one other government comment made during closing argument, is frivolous.

> [T]he prosecutorial argument was also prejudicial for telling the jury they could "bet" that the money went through defendant's hands, (Tr. 657); for such argument encouraged the jury to apply a standard of certainty (*i.e.*, whether the jurors would "bet" that a particular thing is true) at odds with the constitutionally mandated standard of proof beyond a reasonable doubt.

Manos did not object to the bet comment at trial; therefore, we may consider the error only if it constitutes plain error. "[T]he plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)). Once again we are given only part of the story. Certainly juries cannot support a criminal verdict on the basis that they could bet something happened. However, there is not even a colorable claim that they were asked to do that here. Both in its closing argument and rebuttal the government set out its burden several times: it had to prove Manos guilty "beyond a reasonable doubt." The betting colloquialism was no more than a turn of phrase buried within a lengthy factual description of one of the transactions for which Manos was charged.

> [A]nd what does Mr. Bradley tell you? "Well, he spent $15 for a Class II Purveyor's license." $15. That is somehow supposed to erase the thousand dollars that he took? The thousand dollars that he took and that Mr. Bradley admitted, "Well, yeah, it went through Louie's [(Manos)] hands." You *bet* it went through his hands. There is no defense to that count—those counts—involving the Pear Garden. He admitted on the stand that yeah, he set up the deal, he engineered it and aided it and he participated in it and he got $200 off the top.

(Emphasis added.) It is a bit tenuous for Mr. Manos's attorney to claim that the government's argument suggested to the jury that it use a lesser standard of proof to judge this transaction. Here "bet" meant no more than "surely" or "of course," The American Heritage Dictionary 174 (2d College ed.1982), or "to be able to be sure that—usually used in the expression *you bet*, Webster's New Collegiate Dictionary 105 (1976) (emphasis in original). The use here is no more than a matter of style of preference, or mere coincidence, simply phrasing that indicated it went through Manos's hands. Certainly the jury understood as much. In a case such as this where the standard of proof has been clearly articulated to the jury we refuse to find fault with the language of a closing argument that in no way suggests that the jury apply a contrary standard. There simply is no standard attorney lexicon that is mandated for every sentence uttered at closing argument. Instead, the proper inquiry remains what meaning did the jury glean from the prosecutor's comments. Here the jury gleaned that the government was arguing both that "of course" Manos had the money and that the government must prove Manos guilty "beyond a reasonable doubt." No miscarriage of justice occurred. Manos's argument must fail.

## III. CONCLUSION

As to the evidentiary matters, the district court did not abuse its discretion. Like-

wise, the government's closing argument did not deny Manos a fair trial.

AFFIRMED.