**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Darryl TIPTON, Defendant–Appellant.**

No. 90–3649.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1991.
Decided May 20, 1992.

Kaarina Salovaara, argued, Office of the U.S. Atty., Criminal Div., Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Martin S. Agran, argued, Agran & Agran, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge,
CUMMINGS and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

The defendant-appellant, Darryl Tipton, appeals his conviction for embezzling money and evading federal income tax, alleging that the district court abused its discretion in admitting samples of his handwriting in evidence, the government's closing argument was improper, and that the evidence was insufficient to support a finding of guilt. We affirm.

## I. FACTS

On January 4, 1990, a federal grand jury returned a six-count indictment against the defendants Tipton (four counts) and Sam Clark (two counts) for their role in a fraudulent payout scheme involving money from the Department of Housing and Urban Development. Clark pled guilty prior to trial and testified on behalf of the government at Tipton's trial. Tipton was charged with two counts of embezzling money of the United States in violation of 18 U.S.C. § 641[1] as well as with two counts of evading federal income tax in 1984 and 1985 in violation of 26 U.S.C. § 7201,[2] and proceeded to trial on August 22, 1990.

The Department of Housing and Urban Development ("HUD") provided the City of Aurora, Illinois with money (as part of an annual entitlement grant) to be used by qualified low income homeowners for repair and/or remodeling work of their homes. Tipton worked for the City of Aurora as a rehabilitation specialist in the division of Neighborhood Services from 1983 to 1985. His responsibilities included assisting qualified homeowners through the housing repair application process as well as training and supervising the work of David Kramer, who also worked on housing rehab projects. Following confirmation of the applicant's income, the rehabilitation specialist (Tipton or Kramer) determined the applicant's eligibility, inspected the applicant's home and prepared a draft-specifications sheet listing the details of the work project. Contractors submitted sealed bids for the projects, and once the bids were opened, the rehabilitation specialist and the homeowner determined whether to proceed. If the homeowner decided to proceed, the rehabilitation specialist assisted in preparing the applicant's written loan proposal, which was in turn forwarded to Tipton's immediate su-

1. **"18 U.S.C. § 641. Public money, property or records**

   "Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

   "Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

   "Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not ex-

ceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

   "The word 'value' means face, par, or market value, or cost price, either wholesale or retail, whichever is greater."

2. **"26 U.S.C. § 7201. Attempt to evade or defeat tax**

   "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution."

pervisor, Patricia Casler, and ultimately to the City Council of Aurora, Illinois. If the City Council approved the loan, it would adopt a resolution approving a transfer of funds. After the City Council's approval of the transfer of funds from the City's bank account to the homeowner's individual account, the rehab specialist prepared, signed, and submitted a cover letter to the bank enclosing the City's resolution and a "transfer of funds" form requesting that the bank set up an individual account for the homeowner. The "transfer of funds" form directed to the bank was signed by the rehab specialist, the comptroller and the mayor. The approval process did not require independent investigation of the loan proposals submitted by Tipton.

After the project was completed, the contractor was required to forward a signed completion notice to either Tipton or Kramer certifying completion of the contract. The rehabilitation specialist was supposed to inspect the home and verify the completion of the project. Following the verification, the specialist completed a payout authorization form which required three signatures, those of the homeowner, the rehabilitation specialist and Pat Casler (Tipton's immediate supervisor). Casler testified that it was her usual practice not to independently inspect Tipton's work before approving the payout form. Once the payout form was signed by these three, the bank reviewed the form to determine whether it was properly executed. The bank then prepared the check in the name of the homeowner and entered the debit on a ledger card, recording the date of the check, the amount and the name of the contractor paid.

At trial, the government relied extensively on the testimony of Sam Clark, an old friend and distant relative of Tipton. In the early 1980's, Clark was working on a number of rehabilitation projects for the City of Aurora.[3] Clark testified that in the summer of 1983, Tipton suggested a fraudulent payout scheme to him in which several unidentified contractors who lacked the necessary insurance coverage would oper-

ate under Clark's name and insurance, and upon receipt of payout authorizations, the City's bank would issue payout checks in Clark's name. Tipton further proposed that Clark cash the checks and give the money to Tipton, who would in turn take care of the uninsured contractors. Clark agreed to the plan, and several months later Tipton called Clark at a job site and asked him to pick up a check at Aurora Federal Savings & Loan. Clark followed Tipton's instructions, picked up and cashed the check, placed the money in an envelope, and delivered it to Tipton. At this time Tipton gave Clark some of the money. Clark testified that this procedure continued from the summer of 1983 to January of 1985. Clark stated he picked up approximately twenty or thirty checks from the Aurora Savings & Loan for work that he never performed, and he received approximately $200 to $300 from Tipton for each check he cashed.

Around May of 1984, assistant rehabilitation specialist David Kramer sent a letter to Georgana Brison, a rehabilitation applicant who had been on his case list since 1983, to determine why she had not completed her rehab application. After a period of time and receiving no answer from Brison, Kramer stated that he reviewed her file and discovered it contained a City Council resolution transferring funds to an account in Brison's name. Kramer testified that he was surprised at this unusual procedure, for he had not done any work to initiate a resolution transferring funds. Kramer stated that he inquired of Tipton concerning the transfer of funds resolution in Brison's file, and Tipton replied that the rehabilitation process had been restructured so that the funds were now approved as soon as the rehabilitation work was identified. Kramer related that he advised Tipton that Brison was not interested in participating in the program and asked him to have the resolution authorizing the transfer of funds to Brison's account rescinded, and Tipton replied that he would take of it. Several months later, Kramer again asked Tipton to have the City cancel Brison's

3. Clark did primarily painting and carpentry jobs, and employed several of his sons.

transfer of funds resolution, and Tipton replied once again that he would take care of it. Unbeknownst to Kramer, the bank had transferred the HUD funds from the City's account into Brison's loan account prior to his conversations with Tipton. On April 27, 1984 and May 1, 1984, the bank issued payout checks to Sam Clark for $8,000 and $4,000 respectively, for Brison's alleged home rehabilitation. Clark testified that he gave all the cash from these checks to Tipton.

Patricia Casler testified that her name had been forged on certain payout forms and that she had never authorized anyone to enter her signature on any form indicating approval. In addition, approximately twenty rehabilitation applicants testified and disavowed the authenticity of their respective signatures on payout forms and stated further that the work described as completed in certain invoices or payout forms had never been performed. Kramer testified that certain signatures and handwriting on rehabilitation applicants' bogus "transfer of funds" forms, payout forms and invoices appeared to be Tipton's. Robin Hunton, a forensic document examiner of more than twelve years experience in the field, who has examined thousands of documents, testified concerning her examination and comparison of various rehabilitation documents with handwriting exemplars supplied by Tipton and likewise stated that Tipton's handwriting appeared on a number of these forged documents.

Joe Mazzura, an agent with the Internal Revenue Service, also testified for the prosecution regarding Tipton's 1984 and 1985 federal tax returns. Mazzura stated that after comparing Tipton's reported income for 1984 and 1985 with the sum of money involved in the embezzled checks Clark cashed and gave to Tipton, he was of the opinion that Tipton failed to report income of $146,715 in 1984 and $14,903.50 in 1985.

Following trial, the jury found the defendant guilty on two counts of embezzling money of the United States and two counts of evading federal income tax in 1984 and 1985. The district court sentenced Tipton to four years imprisonment on the two counts of embezzlement and one count of tax evasion to be served concurrently with each other, but consecutive to a state sentence Tipton was then serving, followed by five years of probation on the remaining tax evasion count to be served consecutively to the federal term of imprisonment. The district court also ordered Tipton to participate in drug screening, to pay a special assessment of $200, and to pay restitution to HUD in the amount of $18,500.

## II. ISSUES FOR REVIEW

The defendant raises the following issues on appeal: (1) whether the district court abused its discretion in admitting in evidence the identification of the defendant's handwriting, since Robin Hunton was, in his opinion, unqualified to testify as a handwriting expert, and the probative value of David Kramer's lay opinion of Tipton's handwriting was purportedly outweighed by its prejudicial effect; (2) whether the prosecution's closing argument constituted misconduct and violated his due process right to a fair trial because of alleged references to Tipton's failure to testify and a supposed misstatement of the law concerning the presumption of a criminal defendant's innocence; and (3) whether the evidence was sufficient to find him guilty beyond a reasonable doubt.

## III. DISCUSSION

### A. Handwriting Identification

The defendant contends the district court abused its discretion in admitting the expert testimony of Robin Hunton, a forensic document examiner. In his brief, the defendant asserts that "[o]n a preliminary examination, it may have seemed that Ms. Hunton was a qualified examiner of questioned documents" but "once she was subjected to cross-examination, it became evident that her expertise was only superficial." The district court has broad discretion when deciding to admit expert testimony, and its determination will be affirmed unless it is manifestly erroneous. *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.1990). Federal Rule of Evidence 702 allows a trial court to

admit the testimony of a "witness qualified as an expert by knowledge, skill, experience, training, or education" if his or her expert testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Courts have found the qualification of a handwriting expert to be sufficient where the expert testifies to related experience, knowledge or training. *United States v. Marler,* 614 F.2d 47, 50 (5th Cir.1980); *United States v. Green,* 523 F.2d 229, 236–37 (2d Cir.1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976); *United States v. Tovar,* 687 F.2d 1210, 1215 (8th Cir.1982).

■ At trial, Hunton testified that as a forensic document examiner for the United States Department of the Treasury, she worked in an IRS laboratory examining documentary evidence containing known and questioned handwriting. She has examined documents for more than twelve years and estimated that she has examined thousands of documents. Furthermore, Hunton has testified in judicial proceedings approximately twenty-four times and is a member of many forensic science and document examining societies.[4] She has received additional training, instruction and experience while working as a lab technician in the FBI laboratory (Documents Section) and through her attendance in classes offered by the FBI and related organizations. We agree with the district court that the government's expert witness had more than sufficient training, knowledge, experience and expertise to qualify as an expert regarding forged documents. *See Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1308 (7th Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989) ("Experience and knowledge establish the foundation for an expert's testimony...."). In our opinion, the defendant has failed to demonstrate that the district court's decision to admit the testimony of Robin Hunton as an expert witness in the area of forensic document examination was an abuse of discretion.

■ The defendant also argues that the trial court improperly admitted the testimony of his co-worker, David Kramer, regarding Tipton's handwriting on several of the forged documents. The defendant alleges in his brief that "Kramer stated that the writing appeared to be that of Tipton ..., but he was not certain." The defendant further alleges that the probative value of Kramer's lay opinion as to the handwriting was substantially outweighed by its prejudicial effect and was "therefore violative of Federal Rule of Evidence 403 and [the] defendant's due process rights."[5] The district court's determination on the admissibility of evidence will be upheld unless it appears that the court clearly abused its discretion. *See United States v. Covelli,* 738 F.2d 847, 854 (7th Cir.), *cert. denied,* 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984). "Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court." *United States v. Manos,* 848 F.2d 1427, 1429 (7th Cir.1988) (citation omitted).

The district court admitted Kramer's testimony regarding his lay opinion as to the identification of Tipton's handwriting on various documents over the defendant's objection. Federal Rule of Evidence 701 provides that:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

Moreover, Federal Rule of Evidence 901 states in pertinent part:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

---

**4.** She graduated from the University of Wisconsin and has graduate credits in criminal justice from George Washington University.

**5.** **"Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time**

**"Rule 901. Requirement of Authentication or Identification**

**(a) General provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

**(b) Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

. . . .

**(2) Nonexpert opinion on handwriting.** Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation."

Although we have not previously addressed the issue of lay opinion testimony regarding the identification of handwriting, other circuits have allowed the admission of lay witnesses' handwriting testimony. In *United States v. Barker*, 735 F.2d 1280, 1283 (11th Cir.), *cert. denied*, 469 U.S. 933, 105 S.Ct. 329, 83 L.Ed.2d 266 (1984), the Eleventh Circuit affirmed the trial court's decision to admit the testimony of two coworkers of the defendant that "they were familiar with the defendant's handwriting and stated that in their opinions it matched or was similar to the handwriting on the checks." The Eleventh Circuit held that this testimony was properly admitted under Federal Rule of Evidence 701 and 901(b)(2). *Id.* Moreover, in *United States v. Whittington*, 783 F.2d 1210, 1214–15 (5th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986), the Fifth Circuit affirmed the trial court's decision to admit a document on the basis of lay opinion testimony identifying the defendant's signature on it. Like the lay witnesses in *Barker*, the witnesses in *Whittington* were also lay co-workers of the defendant who testified that they were familiar with the defendant's signature. The court admitted the document even though the witnesses did not see the defendant sign it because "[a] signature may be identified by testimony of a person familiar with the signature." *Id.* at 1215 (footnote omitted).

Because Kramer was familiar with Tipton's handwriting and signature as a result of observing many of the rehabilitation documents Tipton prepared, we are of the opinion that Kramer was qualified to testify regarding Tipton's signature and handwriting. The trial court did not abuse its discretion in admitting Kramer's testimony identifying Tipton's handwriting or signature on the phony documents.

Tipton's contention that Kramer was not "certain" in his identification of Tipton's handwriting is a mischaracterization of the trial record. On cross-examination Kramer testified to the following questions by counsel:

"DEFENDANT'S COUNSEL: And when you talked [on direct examination] about these signatures here, you always said they appeared to be Mr. Tipton's signature; is that correct?

KRAMER: Yes, I did.

. . . .

DEFENDANT'S COUNSEL: You don't know for sure that they are; is that correct?

KRAMER: *Unless I absolutely saw him sign it, I can't be absolutely certain.*"

(Emphasis added). On cross-examination Kramer merely related that he could not be "absolutely certain" that a signature was Tipton's unless he observed Tipton actually sign the document. That is the kind of statement we might expect from a truthful witness who wants to be careful to tell the whole truth and nothing but the truth. Without actually observing Tipton sign the documents, certainly it was more accurate and proper for Kramer to state that the signatures "appeared" to be Tipton's than to say that he was "absolutely certain" of the fact.

**B. Closing Argument**

■ Tipton argues that the prosecutor's closing argument was improper because the prosecutor allegedly misstated the law concerning the presumption of innocence when she stated in closing argument that after hearing all of the evidence, Tipton was guilty:

"PROSECUTOR: Darryl Tipton was innocent as he sat here, [defense counsel] told you. When you came into the courtroom and knew nothing about Darryl Tipton you had to presume him innocent. That's the way our system works and that's the way we want it to work. That's the way our system is fair, and we would all want that if we were sitting in that seat. But as you sit here now and you've heard all the evidence, Darryl Tipton isn't innocent.

DEFENSE COUNSEL: Objection, Judge. That's an improper statement of the law.

THE COURT: The jury will take the instructions, and to the extent that counsel's argument differs from the instruction, you'll disregard counsel's argument.

PROSECUTOR: Ladies and gentlemen, what you will find when you go into that jury room, when you study the evidence that you heard in the case, you'll find not that Darryl Tipton is a rehabilitation specialist but that he is a rehabilitation fraud."

This court has previously addressed the issue of what a defendant must prove in order to demonstrate prosecutorial misconduct:

"Allegations of prosecutorial misconduct are generally rooted in the due process clause. The touchstone of such a constitutional claim is the fairness of the trial, not the culpability of the prosecutor. Thus, 'we consider the prosecutor's conduct not in isolation but in the context of the whole trial in order to determine if such conduct was so inflammatory and prejudicial [that] it deprived the defendant of a fair trial.' We also recognize that there will be some cases where the prosecutor's misconduct does not rise to constitutional dimension. In that context, and only in federal cases, where courts exercise supervisory power, we will consider whether the prosecutor's conduct had a 'substantial influence' on the result of the trial. *We need not reach either of these tests, however, until the defendant has shown that the prosecutor actually engaged in misconduct during the course of the criminal proceeding.*"

*United States v. Weaver,* 882 F.2d 1128, 1140–41 (7th Cir.), *cert. denied,* 493 U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989) (citations and footnote omitted) (emphasis added). The transcript reveals that the prosecutor merely commented upon the evidence in the record, and each reference to the defendant's guilt was prefaced by a reference to the government's case: "as you sit here now and *you've heard all the evidence,* Darryl Tipton isn't innocent." *"[W]hen you study the evidence ... you'll find ... that he is a rehabilitation fraud."* (Emphasis added). The prosecutor's remarks merely related to the inferences to be drawn from the evidence to rebut the presumption of innocence. This court has refused "to adopt [a] defendant's curious view that it is improper for the prosecutor to argue to the jury that a defendant is guilty." *United States v. Auerbach,* 913 F.2d 407, 418 (7th Cir.1990). Moreover, the prosecutor's comments were not an impermissible comment of her personal opinion regarding the defendant's guilt. *See United States v. Spivey,* 859 F.2d 461, 466 (7th Cir.1988) (Prosecutor's characterization of defendants as "con men" was a reasonable inference based on the evidence, not the prosecutor's personal opinion of the merits of the case). As the prosecutor's comments did not rise to the level of prosecutorial misconduct, we need not consider whether the remarks affected the outcome of the trial. *See Weaver,* 882 F.2d at 1140–41.

■ The defendant also alleges that his "Fifth and Fourteenth Amendment due process rights were violated when the prosecutor in her [closing] argument, commented on the defendant's failure to testify at trial." Allegedly the prosecutor's comment referring to the defendant's failure to testify occurred in the context of the prosecutor referring to an interview that occurred in February 1985 at Tipton's City Hall Office when he voluntarily met with two FBI agents. We do not agree with the appellant's argument that the following remarks amount to a comment on his failure to testify at trial:

"PROSECUTOR: We know from the homeowners that he often never visited these homeowners. They never met Darryl. Many of the homeowners say he may have come once; he may not have come. But if he was telling the truth that he visited all these homes you will see from the payout authorizations and the things in your big black book that there were some owners for which the defendant filled out pay outs only for Sam Clark's work.

"Now, if the defendant were to say to you, well, I relied on Sam Clark, I trusted him, he was an old friend, I thought he really did the work, *then he would have said to the agent*, well, I always visited the homes except when the work was done by my friend, Sam Clark, who I trusted for him to do the work, but he didn't.

DEFENSE COUNSEL: Judge, I'm going to object to what he said, and I'm going to make a motion for mistrial.

THE COURT: Objection is overruled. The motion for mistrial is denied. I'm going to—

PROSECUTOR: *Ladies and gentlemen, he certainly could have said, that, but he didn't say that.*

DEFENSE COUNSEL: Objection to what he could have said, Judge.

THE COURT: It is an argument, and the jury can determine to what extent the inference is based on the evidence. The objection is overruled."

(Emphasis added). The prosecutor was alluding to what Tipton would have said *to the FBI agent* if the defendant were to take the position that he inspected the work of all contractors other than Sam Clark. The appellant fails to explain how the prosecutor's comment refers to his failure to testify, and in our opinion it does not. But even if by some stretch of the imagination that language "if the defendant were to say to you" could be construed as pointing to the defendant's failure to testify, it would at most be an indirect reference. "[I]ndirect references to a defendant's silence at trial violate the Fifth Amendment only if the 'language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify.'" *United States v. Perez*, 870 F.2d 1222, 1229 (7th Cir.1989) (citations omitted). The prosecutor's reference to the position Tipton could possibly have taken not only fails to "naturally and necessarily" refer to Tipton's failure to testify, it would be unreasonable to construe the language in its context as a comment on the defendant's failure to testify.

## C. Sufficiency of the Evidence

■ The defendant contends that the government's evidence was insufficient to prove guilt beyond a reasonable doubt. Specifically, the defendant alleges among other things that with the exception of Sam Clark's testimony, there was no direct evidence of his participation in a scheme to embezzle money provided to the City of Aurora by HUD. A defendant attacking the sufficiency of the evidence has a heavy burden and " '[o]nly where the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.' " *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984) (citation omitted). Furthermore, all reasonable inferences must be drawn in favor of the government. *United States v. Douglas*, 874 F.2d 1145, 1151 (7th Cir.), *cert. denied*, 493 U.S. 841, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989).

■ The defendant seems to have forgotten that the trial testimony revealed that in 1983, the defendant approached Sam Clark and suggested that Clark cash rehabilitation payout checks and turn the money over to Tipton. Clark testified that he had cashed approximately thirty payout checks at the direction of Tipton for work that had never been performed. In addition, Clark was paid for work never performed, according to the testimony of approximately twenty homeowners. The record establishes that Tipton controlled the transfer and payout and thus had the ability to direct a false transfer and payout

scheme. The record further established that the defendant's co-worker, David Kramer, city officials, and committees relied on Tipton to properly prepare the "transfer of funds" forms and the payout forms. A number of applicants testified that documents in their files had been falsified. Kramer identified signatures and handwriting on documents in those files as being Tipton's. The government's handwriting expert, Robin Hunton, a forensic document examiner, identified four signatures on the falsified documents as being Tipton's. This testimony concerning the fraudulent scheme is consistent with other portions of the record dealing with Tipton's ability to direct the unauthorized transfer of funds and payout scheme. Finally, the government presented the testimony of an IRS agent, who stated that Tipton failed to report income of $146,175 in 1984 and $14,903.50 in 1985 on his federal tax returns. We are convinced that the government's overwhelming testimony of Tipton's guilt established that he had fraudulently created, directed and operated a scheme to embezzle thousands of dollars of United States monies and evaded federal income taxes, as set forth in the indictment.

## IV. CONCLUSION

The decision of the district court is AFFIRMED.