**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**George R. KESKEY, Jr.,
Defendant–Appellant.**

**No. 87–2260.**

United States Court of Appeals,
Seventh Circuit.

Argued May 25, 1988.

Decided Sept. 20, 1988.

As Amended Dec. 21, 1988.

Stephen M. Glynn, Shellow, Shellow & Glynn, Milwaukee, Wis., for defendant-appellant.

Mel S. Johnson, Asst. U.S. Atty., Patricia J. Gorence, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before WOOD, Jr. and FLAUM, Circuit Judges, and WILL, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant George Richard Keskey, Jr. was indicted for three crimes. In Count 1 of the indictment, Keskey was charged with conspiring to make false statements for the purpose of influencing federally insured financial institutions to grant loans, in violation of 18 U.S.C. § 371. Counts 2 and 3 charged Keskey with aiding and abetting Ronald (Jack) Stilwell in making false statements in mortgage notes submitted to a federally insured savings and loan, in violation of 18 U.S.C. §§ 2, 1014. Following a jury trial, Keskey was found guilty of all counts. The court sentenced Keskey to two years imprisonment on each count, with the sentences to run concurrently. Keskey appeals his conviction.

## I. FACTUAL BACKGROUND

Michael Maciejewski, the Milwaukee branch manager for American Title Insurance Company (ATIC), solicited the title insurance business of John Huber, a local real estate investor. Huber asked Maciejewski whether ATIC would be willing to write title insurance commitments and policies that would not reveal the existence of outstanding mortgages on the subject property. This procedure is referred to as "insuring-over." Huber assured Maciejewski that he would satisfy the undisclosed mortgages after closing on the subject property. Keskey, chief title officer and Wisconsin state legal counsel for ATIC, was present when Bill Suhr, ATIC's Wisconsin state manager, approved the insure-over operation. Keskey voiced no objections or reservations.

The insure-over scheme continued at ATIC from the fall of 1981 until March 1983, involving fifty to seventy-five separate transactions. Although Keskey knew

of the ongoing insure-over operation, he never objected or attempted to stop it. In fact, Keskey's name appeared on several policies relating to Huber's properties that had been insured-over.

## II. DISCUSSION

### A. Testimony Read to the Jury

One of the primary issues at trial was the knowledge and participation of Keskey in the insure-over scheme. To prove Keskey's knowledge and participation, the government elicited testimony from Ann Racynski Sardina regarding an indemnity agreement in which Huber agreed to indemnify ATIC to the extent of $4,557,450 for losses ATIC might suffer as a result of certain undisclosed mortgages. Sardina testified that Keskey had drafted the indemnity agreement and had given it to her to type. Sardina explained that she typed Keskey's name on the second page of the document in accordance with the standard office practice of typing the name of the person who had drafted a document under the line on which he was expected to sign. Sardina's testimony regarding the indemnification agreement was significant because if Keskey actually drafted the document, that would be strong evidence of his knowledge and acquiescence in the fraudulent insure-over scheme.

During deliberations, the jury asked to review Sardina's testimony concerning the indemnity document. The court properly recognized that whether to read back testimony to the jury is a matter purely within the court's discretion. *United States v. Croft,* 750 F.2d 1354, 1367 (7th Cir.1984). *Accord United States v. Padin,* 787 F.2d 1071, 1076 (6th Cir.), *cert. denied,* 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986); *United States v. Anderson,* 782 F.2d 908, 917 (11th Cir.1986); *United States v. Zarintash,* 736 F.2d 66, 69–70 (3d Cir.1984). The court conferred with counsel, at which time Keskey's trial counsel,[1]

---

\* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. Keskey is represented by different counsel on appeal.

Gary McCartan, strongly objected to the court reading any portion of the testimony to the jury. The court considered a number of factors, including the risk that reading a portion of the testimony to the jury would unduly emphasize that testimony. After carefully weighing the advantages and disadvantages, the court decided to have the court reporter read back the relevant testimony to the jury. Although courts sometimes refuse to read back testimony at the jury's request,[2] Keskey does not argue that the court's decision to allow testimony to be read back to the jury was an abuse of discretion.

Although the court reporter did read a portion of Sardina's testimony to the jury, no contemporaneous record was made of exactly what portion of the testimony she read. The record merely indicates that "the appropriate portions of testimony was [sic] read to the jury." After filing his notice of appeal, Keskey filed a motion with the district court to reconstruct the record pursuant to Rule 10 of the Federal Rules of Appellate Procedure.[3] The court granted the motion and directed the parties to submit statements outlining which portions of Sardina's testimony were read to the jury. The district court then entered an order identifying which transcript pages of the Sardina testimony had been read to the jury, concluding that all testimony relating to the indemnity document had been read.

In their submissions to the district court, the parties disagreed as to which portions of Sardina's testimony were read to the jury. McCartan had taken notes while the court reporter was reading the testimony to the jury; those notes stop at page 497, line 5 of the transcript, including only seventeen lines of cross-examination. Keskey argued that only the testimony corresponding to McCartan's notes was read to the jury.

The government, however, argued that ninety-seven additional lines of cross-examination and re-cross-examination had been read to the jury. The Assistant United States Attorney did not take notes during the reading of testimony to the jury; instead, he followed the notes that he had taken during Sardina's testimony at trial. In his affidavit, the Assistant United States Attorney stated that everything in his notes relating to the indemnity document had been read to the jury. In addition, the Assistant United States Attorney recalled that, at one point during the reading, either he or McCartan stated that there was an additional portion of Sardina's testimony relating to the indemnity document that had not yet been read. According to the Assistant United States Attorney, the court reporter then located the additional testimony and read it to the jury. The govern-

---

**2.** *See, e.g., Croft,* 750 F.2d at 1367; *United States v. McCoy,* 517 F.2d 41, 44 (7th Cir.), *cert. denied,* 423 U.S. 895, 96 S.Ct. 195, 46 L.Ed.2d 127 (1975).

**3.** Rule 10 states, in pertinent part:
 (c) Statement on the Evidence or Proceedings When No Report Was Made or When the Transcript is Unavailable. If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement shall be served on the appellee, who may serve objections or proposed amendments thereto within 10 days after service. Thereupon the statement and any objections or proposed amendments shall be submitted to the district court for settlement and approval and as settled and approved shall be included by the clerk of the district court in the record on appeal.
 . . . .

 (e) Correction or Modification of the Record. If any difference arises as to whether the record truly discloses what occurred in the district court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the district court either before or after the record is transmitted to the court of appeals, or the court of appeals, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the court of appeals.
 Fed.R.App.P. 10(c), (e).

ment argued that this indicated that testimony beyond that reflected in McCartan's notes was read. Finally, the government pointed out that when the court reporter had finished reading, neither party objected to the accuracy of the testimony read, and both conceded its completeness.[4]

 The court agreed with the government and found that the additional ninety-seven lines of testimony had been read to the jury. We must accept the court's reconstruction of the record under Federal Rule of Appellate Procedure 10(c) unless it was intentionally falsified or plainly unreasonable. *United States v. Mori,* 444 F.2d 240, 246 (5th Cir.), *cert. denied,* 404 U.S. 913, 92 S.Ct. 238, 30 L.Ed.2d 187 (1971); *Belt v. Holton,* 197 F.2d 579, 582 (D.C.Cir. 1952); 9 J. Moore, B. Ward & J. Lucas, Moore's Federal Practice ¶ 210.08[1], at 10–48 (2d ed. 1987); *see Buick v. United States,* 396 F.2d 912, 913–14 n. 1 (9th Cir. 1968), *cert. denied,* 393 U.S. 1068, 89 S.Ct. 724, 21 L.Ed.2d 711 (1969).[5]

 Keskey does not claim that the district court's reconstruction of the record was intentionally false. Keskey argues that McCartan's notes, which were the only notes taken of the exact testimony read to the jury, are the best evidence available for reconstructing the record. After reviewing the submissions of both parties, however, the court found that more testimony had been read to the jury than indicated by McCartan's notes. We do not believe that this conclusion was plainly unreasonable. The Assistant United States Attorney remembers that the court reporter skipped ahead a few pages and read additional testimony to the jury. The portion that Keskey claims was read to the jury, however, is contained in one continuous passage. In addition, the court relied on the Assistant United States Attorney's trial notes that he reviewed while the testimony was read to the jury. Therefore, the court's reconstruction of the record was not plainly unreasonable.

Keskey makes several other arguments in relation to the reading back of testimony to the jury.[6] Nevertheless, as Keskey's appellate counsel conceded at oral argument, if the district court's reconstruction efforts pursuant to Rule 10 resulted in a reliable record, Keskey must lose on his other arguments. Therefore, we affirm the district court's reconstruction of the record and find that the court did not abuse its discretion in allowing the relevant por-

---

**4.** After the court reporter had finished reading Sardina's testimony to the jury, the following discussion occurred:

> THE COURT: Is the government satisfied that we have read all about the indemnification? [ASSISTANT UNITED STATES ATTORNEY]: I don't have any more notes.
> THE COURT: Defense?
> MR. MCCARTAN: I believe that they have all been covered, Your Honor.

Tr. at 780.

Not only did McCartan fail to object to the completeness of the reading, he apparently acknowledged that all pertinent testimony had been read. Thus, the government argues that Keskey waived any objection concerning whether all pertinent testimony had been read. *See United States v. Gallo,* 763 F.2d 1504, 1531 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986) and 474 U.S. 1068, 106 S.Ct. 826, 88 L.Ed.2d 798, 474 U.S. 1069, 106 S.Ct. 828, 88 L.Ed.2d 800 (1986) (three petitions for certiorari denied). Keskey responds that a knowing and intelligent waiver as to the completeness of the testimony read was not possible because there was no transcript available for counsel to review. In any event, even if Keskey did not waive his objection as to the reading's completeness, Keskey admits that the district court found that all pertinent portions of Sardina's testimony were read. Thus, if we uphold the district court's reconstruction of the record, Keskey concedes that the reading was complete.

**5.** Keskey argues that some other standard of review should apply. Keskey suggests an abuse of discretion standard, but cites no cases applying that standard. Keskey also argues that the standard of review proposed by the government, the intentionally false or plainly unreasonable standard, should not apply here because, unlike the case in *Mori,* 444 F.2d at 246, the trial judge here did not base his reconstruction of the record on his own recollection of the proceedings. Contrary to Keskey's assertion, however, the intentionally false or plainly unreasonable standard is not limited to cases in which the judge relies on his own recollection to settle disputes between the parties. *See, e.g., Belt v. Holton,* 197 F.2d 579 (D.C.Cir.1952).

**6.** For example, Keskey argues that the proceedings before the district court violated the requirement that "all proceedings in criminal cases had in open court" must be recorded verbatim. 28 U.S.C. § 753(b).

tions of Sardina's testimony to be read to the jury.

Although we believe that the district court was able to reliably reconstruct the record, situations like this can be easily avoided. If the trial judge, in exercising his discretion, determines that it is appropriate to read back all or a portion of the testimony of a witness, it can be specifically stated on the record in advance where the reading is to begin and where it is to end. If a transcript is available, the portions that are read can be identified by page and line numbers. Another possible method would be to employ a tape recorder. *Cf. United States v. Craig,* 573 F.2d 455, 480 (7th Cir.1977) (although transcript was not available to the reviewing court, tape recording was adequate record), *cert. denied,* 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed. 2d 110 (1978); *United States v. Andiarena,* 823 F.2d 673, 676 (1st Cir.1987) (citing *Craig* ).

## B. Improper Vouching for a Government Witness

Keskey also argues that the government improperly vouched for the credibility of government witness Sheryl Muth Wilke by introducing into evidence a letter that the Assistant United States Attorney sent to Wilke's attorney. The letter outlined an agreement between the government and Wilke that the government would not prosecute Wilke if she cooperated with the government in its investigation and gave truthful testimony. Keskey objects to the following portion of the letter:

> In her statement your client admitted to facts which establish some criminal culpability on her part; however, her statement was consistent with other evidence already acquired which indicates that her culpability was relatively minimal. The information she provided appeared to be truthful, and she is apparently willing to cooperate with the investigation and possible prosecution in this matter.

Tr. at 559–60.

■ Keskey did not object to the letter at trial. Therefore, the admission of this letter can justify reversal only if it was plain error. Fed.R.Crim.P. 52(b). "We recognize plain error if to do otherwise would result in a 'miscarriage of justice.' " *United States v. Manos,* 848 F.2d 1427, 1433 (7th Cir.1988) (quoting *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)). We must view the alleged error in the context of the entire trial. *Manos,* at 1433; *United States v. Fakhoury,* 819 F.2d 1415, 1423 (7th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988).

■ Keskey recognizes that the government may elicit testimony on direct examination regarding a witness's plea or immunity agreement. *See United States v. Mealy,* 851 F.2d 890, 898–899 (7th Cir.1988) (collecting cases). Nevertheless, "[i]n introducing evidence of plea agreements, the prosecutor may not imply that he possessed information not heard by the jury on the issue. of the immunized witness's veracity. Nor can the prosecutor express or imply his personal opinion that a witness is telling the truth." *Id.* at 900 (citations omitted).

■ Keskey argues that the portion of the letter stating that "her statement was consistent with other evidence already acquired which indicates that her culpability was relatively minimal" was an assertion by the government that other undisclosed evidence corroborated Wilke's story. We disagree. As we read the letter, the Assistant United States Attorney merely stated that other evidence indicated that Wilke's degree of culpability was slight, which appears to have been a factor in the government's decision not to prosecute Wilke. The letter does not say that the government believed Wilke because all of her statements were consistent with other undisclosed evidence.

In addition, Keskey argues that the statement that "[t]he information she provided appeared to be truthful" indicated the prosecutor's personal opinion that Wilke was telling the truth. Keskey argues that the jury could infer that the government believed that Wilke was telling the truth because her statement was con-

sistent with other evidence not before the jury. As we explained above, however, the reference in the letter to "other evidence already acquired" related only to Wilke's culpability. Thus, unlike most of the cases that Keskey has cited, we do not believe that the Assistant United States Attorney implied that his personal opinion was based on evidence not before the jury. *See United States v. Berry*, 627 F.2d 193, 198 (9th Cir.1980) (prosecutor's argument that government had kept its witnesses separated to ensure the truthfulness of their testimony was improper), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981); *United States v. Roberts*, 618 F.2d 530, 534 (9th Cir.1980) (prosecutor improperly stated during closing argument that officer who had been present throughout the trial was monitoring the witness's testimony to ensure that the witness kept his agreement to provide truthful testimony) *cert. denied*, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981); *United States v. Bursten*, 560 F.2d 779, 784–85 (7th Cir.1977) (statement in plea agreement that immunized witness was willing to take a polygraph test improperly insinuated that the government had a means of verifying the truth of the witness's testimony other than scrutiny of the witness's testimony at trial); *Gradsky v. United States*, 373 F.2d 706, 710 (5th Cir.1967) (prosecutor not only expressed his personal opinion as to the witnesses' veracity, he implied that he had reached this conclusion because he had had the opportunity to check out the witnesses' credibility). *See also Lawn v. United States*, 355 U.S. 339, 359–60 n. 15, 78 S.Ct. 311, 319 n. 15, 2 L.Ed.2d 321 (1958).

▆▆▆ Nevertheless, the letter does appear to express the personal opinion of the Assistant United States Attorney that Wilke was telling the truth. While it was error to read that statement to the jury, we do not believe it rises to the level of plain error. Although Wilke read the letter

aloud before the jury, the Assistant United States Attorney did not elaborate on it during direct examination,[7] nor was it mentioned during cross-examination. Neither attorney discussed the letter during closing argument. That lack of emphasis makes it less likely that it influenced the jury. Furthermore, Wilke's testimony, while important, was not as directly incriminating to Keskey as some of the other witnesses' testimony. Finally, at the end of the trial, the court instructed the jury to consider Wilke's testimony with caution and great care. Record Item 21 at 4. *See Mealy* at 900–01 (similar instruction to the jury was sufficient to dispel prejudicial effect of improper vouching by the government). Viewing the improper vouching by the government in the context of the entire trial, we find that the risk that Keskey's "substantial rights" were affected is slight; thus, any error that occurred was harmless. Fed.R.Crim.P. 52(a). *See United States v. Jackson*, 485 F.2d 300, 303–04 (7th Cir.1973); *United States v. Grooms*, 454 F.2d 1308, 1312–13 (7th Cir.), *cert. denied*, 409 U.S. 858, 93 S.Ct. 141, 34 L.Ed.2d 103 (1972).

### C. Rebuttal Argument

Keskey's final argument concerns the government's rebuttal during closing argument. Counts 2 and 3 of Keskey's indictment charged him with making false statements in mortgage notes in order to influence a federally insured savings and loan to lend money to Jack Stilwell. In his opening statement, the Assistant United States Attorney explained that Keskey had notarized the mortgage notes at a closing, which indicated that Stilwell had signed the documents in Keskey's presence. The Assistant United States Attorney claimed that Stilwell would testify that he was not present at the closing and therefore Keskey's notarization was false. After the trial began, however, Stilwell apparently

---

7. The Assistant United States Attorney asked only two questions relating to the letter.
[ASSISTANT UNITED STATES ATTORNEY] Did you agree to this agreement as proposed in this letter?
[WILKE] Yes, I did.
[ASSISTANT UNITED STATES ATTORNEY] And have you lived up to your agreement?
[WILKE] Yes, I have.
Tr. at 560–61. Keskey does not claim that either question was improper.

changed his story and the government decided not to call him as a witness. During closing argument, defense counsel suggested that because Stilwell had not testified as the government had promised, Stilwell must have actually attended the closing. In rebuttal, the Assistant United States Attorney argued:

He also asked the question, why isn't Jack Stillwell [sic] here as a witness, why isn't he named as a defendant. Well, you don't know why Jack Stillwell isn't here as a witness. There is no evidence as to Jack Stillwell and why he is not here as a witness. You don't know if Jack Stillwell is alive or dead. You don't know if Jack Stillwell would have taken the Fifth. You don't know if Jack Stillwell has had a brain injury and he can't remember anything. You don't know whether Jack Stillwell can even be found. You don't know, and you can't speculate about it, and an argument like, where is Jack Stillwell, asks you to decide the case based upon what isn't in the evidence.

Well, you can't speculate about what isn't in the evidence. You have to base your decision upon what is in the evidence.

Tr. at 733–34.

Keskey did not object to this argument at trial. Therefore, we can only reverse if the argument constitutes plain error. Fed. R.Crim.P. 52(b); *Manos*, at 1433.

▪ Keskey claims that this argument was improper because it encouraged the jury to speculate about facts that were not in evidence. Of course, an attorney's argument is always limited to the facts in evidence, *United States v. Perez–Leon*, 757 F.2d 866, 875 (7th Cir.), *cert. denied*, 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985), although counsel may make arguments that are reasonably inferred from the evidence. *United States v. Doyle*, 771 F.2d 250, 258 (7th Cir.1985).

Keskey relies on our statement in *United States v. Vargas*, 583 F.2d 380 (7th Cir. 1978), that an inference that the prosecutor draws from the evidence may be "unreasonable enough that the suggestion of it cannot be justified as a fair comment on the evidence but instead is more akin to the presentation of wholly new evidence to the jury, which should only be admitted subject to cross-examination, to proper instructions and to the rules of evidence." *Id.* at 385. In *Vargas*, the prosecutor asserted during closing argument that the defendant was able to post and forfeit a $10,000 bond because of the great amount of money he had earned dealing heroin. There was no evidence at trial regarding the source of the $10,000 bond. This court found that the prosecutor's baseless allusion to prior crimes was especially prejudicial and therefore was reversible error. *Id.* at 387–88. The prosecutor's comments in *Vargas* were much more prejudicial than those in the present case.

Keskey also argues that the government erred by suggesting facts that it knew to be false. Keskey relies on *United States v. Dailey*, 524 F.2d 911 (8th Cir.1975). In *Dailey*, the prosecutor argued that the defendant had not called his brother to corroborate his alibi defense because the brother could not do so, although the prosecutor knew that the brother's testimony would not be unfavorable to the defense. The court found that the argument improperly misled the jury. *Id.* at 917. Unlike *Dailey*, the prosecutor here did not suggest that Stilwell's testimony would damage the defense. The prosecutor merely attempted to caution the jury not to speculate. The risk that the jury would be misled is not nearly as great in this case as it was in *Dailey*. Furthermore, Stilwell was not as crucial to the government's case against Keskey as the alibi defense was in *Dailey*.

▪ We believe that the Assistant United States Attorney's rebuttal argument can best be characterized as a valid response to defense counsel's closing argument that Stilwell had not testified because he was in fact at the closing. *See United States v. Sblendorio*, 830 F.2d 1382, 1392 (7th Cir. 1987) ("the prosecutor may reply to an argument by the defense that the absence of some witness counts against the prosecution"), *cert. denied*, — U.S. —, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988); *Perez–Leon*, 757 F.2d at 875 ("where the defense

counsel refers to evidence outside the record, the government may have to respond with an argument that normally would be considered improper"). We do not believe that the government's argument was plain error. The Assistant United States Attorney repeatedly told the jury that they should not speculate on matters not in evidence. While it may have been poor judgment for the Assistant United States Attorney to suggest reasons for Stilwell's absence that he knew to be false, it was done in the context of demonstrating to the jurors that they should not speculate about matters not in evidence. The Assistant United States Attorney concluded by reiterating that the jury could not speculate as to why Stilwell had not testified. In that context, we do not believe that the mere fact that the Assistant United States Attorney suggested several false reasons for Stilwell's absence transforms his argument into plain error. The fact remains that Stilwell did not testify. Considering the actual testimony of the other witnesses establishing Keskey's guilt, we do not believe that the government's suggested explanations for Stilwell's absence were so likely to mislead the jury that they resulted in a miscarriage of justice. *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985); *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982).

### III. CONCLUSION

We find that the district court's reconstruction of the record was reliable and that the district court did not abuse its discretion in allowing Sardina's testimony to be read back to the jury. The other errors that Keskey complains of were, at best, harmless error.

AFFIRMED.

WILL, Senior District Judge, concurring.

While I agree with most of the majority opinion and the result, I do not agree that in the words of the majority opinion the Assistant U.S. Attorney's suggesting facts to the jury which he knew were false to possibly explain Stilwell's absence after he had told the jury that Stilwell would testify for the government was "a valid response" to the defense counsel's closing argument.

As the majority correctly points out, a prosecutor or any counsel may of course reply to an argument by opposing counsel that the absence of some witness counts against the side having control of the witness but not calling him or her. *See United States v. Sblendorio*, 830 F.2d 1382, 1392 (7th Cir. 1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988). This, however, does not warrant counsel in such a response making false statements of fact or suggesting explanations or facts which counsel knows are false. The prosecutor's doing so here was *clearly improper* and not, in the words of the majority opinion, merely the result of "poor judgment." He knew that his reason for not calling Stilwell was none of the possible reasons he suggested to the jury for Stilwell's absence. There is no excuse or justification for false statements by counsel to either a judge or a jury. I regret that the majority has not seen fit to say so, but has instead stated that lying in court may be and was here "a valid response" to an opponent's argument. In my opinion, it is never justifiable and we should say so as emphatically as possible.

Notwithstanding, I do not believe that the response by the prosecutor constituted plain error. Stilwell was not a key witness and whether or not he was present at the closing was not a material fact. It went only to the question of whether or not Keskey saw Stilwell sign the documents before he notarized them. Considering the testimony of other witnesses establishing Keskey's knowing participation in the scheme to obtain mortgage loans from federally insured financial institutions by filing false statements, I agree with the majority opinion that the government's suggested false explanations for Stilwell's not testifying as promised could not have so misled the jury as to result in a "miscarriage of justice."