2009 WY 133

**Forrest Myles BROMLEY, Appellant
(Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. S-08-0254.

Supreme Court of Wyoming.

Nov. 4, 2009.

Representing Appellant: Jason M. Tangeman of Nicholas & Tangeman, LLC, Laramie, Wyoming.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Graham M. Smith, Assistant Attorney General. Argument by Mr. Smith.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1]   The appellant killed Jason Voss with a shotgun on April 25, 2007. He was charged with second-degree murder, but convicted by a jury of the lesser-included offense of manslaughter. He now challenges that conviction on evidentiary, procedural, and constitutional grounds. Finding no error, we affirm.

## ISSUES

[¶ 2]   1.   Whether the district court's *sua sponte* revision of the trial transcript violated W.R.A.P. 3.02 and 3.04, violated the constitutional separation of powers, and violated the appellant's constitutional right to the due process of law?

2.   Whether the district court abused its discretion by admitting evidence of the appellant's alleged use of methamphetamine?

3.   Whether Wyoming's second-degree murder statute is facially unconstitutional?

## FACTS

[¶ 3]   On April 25, 2007, the appellant and his friend Jason Voss decided to go out and "do some shooting." After finishing some chores at Voss's grandmother's house, the two men went to their residences, where they picked up several guns, including the appellant's 12–gauge Model 870 Remington shotgun. They then drove to another friend's house, where they smoked marijuana. At about 4:00 p.m., they drove to a local restaurant and liquor store where they purchased cheeseburgers, french fries, and an 18–pack of beer. Eventually, they drove out of Encampment toward Saratoga, and turned onto a county dirt road, eating food, drinking beer, and shooting prairie dogs along the way.

[¶ 4]   Around 6:00 p.m., the appellant called Luke Munson, who was the appellant's friend and Voss's cousin, and asked Munson to join them. When Munson arrived, he obtained a beer, and then took an old oil container out and set it up as a target. As Munson was walking back, the appellant shot at the target while Munson was still "down range," which scared Munson.

[¶ 5]   The three men began to throw rocks into the air and shoot at them, and then shot at a sage chicken, which they followed over a ridge, believing they had hit it. When they could not find the sage chicken, the appellant began shooting at a nearby rock with his shotgun. What happened next is the focus of this case. Munson testified that the appellant "[c]hambered a round and turned to his

right, shouldered the gun and aimed at my cousin and shot him." The appellant, to the contrary, testified that he shot at the rock three times, then reloaded three shells, and shot twice more at the rock. Thinking he had shot all three rounds, he turned and, "[w]hen I was turned before I could really bring my eyes around to [Voss], the gun discharged and hit [Voss]." The shotgun blast hit Voss in the chin and neck, and he died within minutes.

[¶ 6] The appellant was charged with second-degree murder, in violation of Wyo. Stat. Ann. § 6–2–104 (LexisNexis 2009). After a preliminary hearing in circuit court, he was bound over to district court for trial on the charged crime. The State's theory of the case was that the appellant was a heavy user of methamphetamine who became volatile and violent when under the influence of the drug. Consequently, the State pursued evidence both of the appellant's historic use of methamphetamine, and his alleged use of the drug on the day of the killing.

[¶ 7] It was not contested that the appellant used marijuana during the afternoon of the shooting. In addition to eye-witness testimony, preliminary tests of the appellant's blood and urine yielded "presumptive positive" results for the presence of marijuana. The blood test was also presumptive positive for the presence of amphetamine, but the urine test was negative in that regard.[1] Confirmation testing of both blood and urine by AIT Laboratories in Indiana produced negative results for amphetamine in both the blood and urine.

[¶ 8] The appellant's pretrial attempt to prevent introduction of his alleged methamphetamine use took the form of a demand for notice of the State's intent to introduce uncharged misconduct evidence under W.R.E. 404(b), which motion was heard on October 9 and 11, 2007. After the hearing, the district court issued a decision letter and an order allowing the State to introduce the marijuana testimony and the marijuana test results, but denying admission of the presumptive positive blood test results for amphetamine.

[¶ 9] At a subsequent pretrial hearing on March 24, 2008, defense counsel informed the district court that he had just learned from the State that two new witnesses—Joseph Cheek and Theodore Sauls—would be called by the State to testify that the appellant had admitted to them that he was using methamphetamine on the day of the killing. After repeating the intent of the decision letter and order governing the methamphetamine evidence mentioned above (*see supra* ¶ 8), the district court told defense counsel to "bring it up just as quickly as you can" if a hearing was necessary regarding the new witnesses.

[¶ 10] On April 10, 2008, the State filed an amended pretrial memorandum adding Theodore Sauls to its witness list. Eighteen days later, a similar document added Michael Evans, "CEO of Toxicology" for AIT Laboratories. The appellant responded with three motions *in limine*, filed on the first day of trial, seeking to preclude the testimony of Cheek, Sauls, and Evans. Noting that Cheek and Sauls would testify about the appellant's supposed admission to using methamphetamine, and that Evans would testify, among other things, that the State's delay in sending the blood sample to AIT may have caused the negative test results to be invalid, the appellant's primary complaint was that, based upon the district court's decision letter and order, the appellant had prepared for trial under the assumption that the issue of alleged methamphetamine use would not be raised, and need not be defended.

[¶ 11] The trial began without any resolution of the defense motions. During the State's opening statement, the prosecutor said the following:

> [The appellant] also gave a statement to his cellmate when he was incarcerated in Carbon County Jail. And his cellmate, who is in jail for a reason—and we've gone over that a little bit in voir dire—will testify that the [appellant] indicated that he had indeed killed Mr. Voss, and the reason for it was he was coming down from drugs. That is the testimony he will give you. . . .

---

**1.** We assume there is no distinction between amphetamine and methamphetamine for pur-

poses of this testing.

Defense counsel immediately moved for a mistrial. The motion was heard at the beginning of the second day of trial. Defense counsel argued first that, as a result of the district court's earlier rulings, he had prepared for trial under the belief that no methamphetamine evidence would be admitted. Second, he argued that he had prepared for trial under the belief that, even if Sauls' and Cheek's allegations somehow got into evidence, he could impeach their testimony with the negative AIT test results. Now, at the eleventh hour, the State intended to call Evans to undermine his own laboratory's reports, thereby destroying those reports' impeachment value. The State countered with the contention that its proposed evidence was not the "old" blood and urine test results that the court had earlier disallowed, but was "new" evidence provided directly by the appellant as a statement against interest.[2]

[¶ 12] Without giving any reason for its ruling, the district court denied the mistrial motion, allowed the admission of Sauls' and Cheek's testimony, disallowed any evidence of the presumptive positive blood test for amphetamine, and allowed defense counsel to impeach Sauls and Cheek with Evans' testimony. The appellant characterizes this ruling as the reversal of W.R.E. 404(b) rulings that had been in effect for six months.

[¶ 13] Cheek did not testify at trial, but Sauls was called as a witness in the State's case-in-chief. Sauls testified that he had been convicted of reckless endangerment for brandishing a knife during a fight with his brother, that he had been incarcerated in the Carbon County jail, part of the time with the appellant as his cellmate, and that the appellant had told him about shooting Voss. The gravamen of Sauls' testimony, as that testimony was originally set forth in the official court reporter's transcript, was as follows:

He told me, and he said that he had shot his friend, and that he didn't mean to do it. He don't know why he did it, but he was all drugged up at the time, and those were his exact words that came out of it his mouth so—I mean, those came from his mouth.

[¶ 14] As its final witness, the State called Dr. Evans, AIT Laboratories' "CEO of Toxicology." Evans testified as to the effect of methamphetamine on the human body and mind, both during use and during withdrawal from use, and testified as to the detectability of methamphetamine in the human body through chemical analysis. The appellant twice moved for a mistrial during Evans' testimony, on the ground that the testimony violated the district court's pretrial order governing W.R.E. 404(b) evidence. Both motions were denied.

## DISCUSSION

*Whether the district court's sua sponte revision of the trial transcript violated W.R.A.P. 3.02 and 3.04, violated the constitutional separation of powers, and violated the appellant's constitutional right to the due process of law?*

[¶ 15] The guilty verdict was rendered on May 9, 2008. The appellant was sentenced on August 12, 2008. The Notice of Appeal was filed on August 15, 2008. After receiving an extension of time for completion of the trial transcript, the official court reporter certified the same to be "true, correct and complete" on November 14, 2008. Ten days later, the Clerk of the District Court provided notice to this Court, pursuant to W.R.A.P. 3.05, that the trial transcript had been completed for purposes of the appeal and had been filed with the district court.

[¶ 16] By February 12, 2009, defense counsel's appellate brief was largely completed. On that date, in an out-of-court informal conversation, defense counsel mentioned to the district court's law clerk that witness Sauls' testimony did not contain any reference to methamphetamine. The law clerk then contacted the district court judge, who contacted the official court reporter, in order to review the transcript. The court reporter, and then the district court judge, compared the original notes with the transcript and determined that the transcript filed as part

2. W.R.E. 804(b)(3) declares that certain statements made against the declarant's interests are not excluded by the hearsay rule. However, inasmuch as W.R.E. 804(b)(3) requires the declarant to be unavailable, it may be that the prosecutor meant to refer to an "admission by a party-opponent" which admission is not hearsay according to W.R.E. 801(d)(2).

of the court record did not accurately reflect Sauls' testimony. Relying upon W.R.A.P. 3.04, the district court informed counsel after brief telephonic contact on February 12 and 13, 2009, that it intended to correct that portion of Sauls' testimony quoted *supra* ¶ 13, to read as follows:

> He didn't know why he did it, but he was all drugged up at the time. He was drugs at the time. (sic) I think the exact words that came out of his mouth were I was all methed out. I mean, those came from his mouth.

[¶ 17] Wyo. Stat. Ann. §§ 5–3–403 through 5–3–406 (LexisNexis 2009) require the official court reporter to produce the official transcript of criminal proceedings, including trials, and to file the transcript as part of the official court record. W.R.A.P. 2.05 and 2.06 provide the process whereby, concurrently with the filing of a notice of appeal, the appellant arranges with the court reporter for pertinent portions of the transcript to be made part of the appellate record. W.R.A.P 3.02 lists the portions of the transcript that must be included in the appeal of a criminal proceeding. Especially pertinent to the present issue is W.R.A.P. 3.04, which allows for the correction or modification of the record:

> If any difference arises as to whether the record discloses what occurred in the trial court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated, the parties by stipulation, or the trial court either before or after the record is transmitted to the appellate court, or the appellate court on motion or its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the appellate court by motion.

The district court specifically referred to, and relied upon, W.R.A.P. 3.04 in amending the transcript as set forth above. *See supra* ¶ 16.

[¶ 18] The appellant urges this Court to consider this to be a matter of the admissibility of evidence, and to review the district court's decision under an abuse of discretion standard, with the "constitutional dimensions" reviewed *de novo*. The State, on the other hand, considers this to be an interpretation of a rule of procedure, which interpretation should be reviewed *de novo*. We have said, however, that "[w]hen this Court construes court rules that are virtually identical to their federal counterparts, relevant federal authority is persuasive." *Walters v. State*, 2008 WY 159, ¶ 13, 197 P.3d 1273, 1277 (Wyo.2008). The federal standard for reviewing Federal Rule of Appellate Procedure 10(e), which is substantially similar to W.R.A.P. 3.04, is to treat the trial court's reconstruction of the record as conclusive, absent a showing of intentional falsification or plain unreasonableness. *United States v. Zichettello*, 208 F.3d 72, 93 (2d Cir.2000); *United States v. Keskey*, 863 F.2d 474, 478 (7th Cir.1988); *United States v. Mori*, 444 F.2d 240, 246 (5th Cir.1971); 5 Am.Jur.2d *Appellate Review* § 463 (2007).

[¶ 19] Preliminarily, we will note that, on its face, W.R.A.P. 3.04 allows the district court to settle the record whenever any difference arises as to whether the record is accurate; it does not require the district court to await a motion from one of the parties. In the instant case, a difference arose as to the accuracy of the transcript when defense counsel voiced a translation of the transcript that did not comport with the memory of the district court. We would propose that, once that difference became apparent to the district court, a duty arose for the district court to settle the difference. Furthermore, W.R.A.P. 3.04 contemplates such a correction by the district court either before or after the record has been transmitted to this Court.

[¶ 20] The appellant has never suggested that the district court engaged in intentional falsification in having the transcript corrected. That leaves only the question of whether the district court's determination was "plainly unreasonable." Other portions of the transcript, itself, belie that suggestion. Dur-

ing his cross-examination, the appellant testified as follows:

Q. Did you hear the testimony from your cellmate?

A. Which one?

Q. Did you hear the testimony of your cellmate as far as methamphetamine?

A. Yes, I did.

Q. And you heard him testify that he told you what he had done, and you told him what you had done. You heard that testimony; isn't that correct?

A. That's correct, I heard that.

Q. And you heard that you were sorry for shooting your friend. Did you hear that?

A. Yes, I heard that.

Q. But you were under the influence of methamphetamine. Did you hear him say that?

A. Yes, I heard him say that.

[¶ 21] These statements clearly reference the testimony of Theodore Sauls that is at issue here. We would be hard-pressed to find "plainly unreasonable" the district court's recollection of Sauls' testimony as having mentioned methamphetamine, when the appellant, contemporaneously and under oath, stated that such was the testimony. Furthermore, during closing argument, both the prosecutor and defense counsel used the phrase "meth'd out" or "meth'd up" in referring to Sauls' testimony about the appellant's jailhouse statement. Clearly, there was no doubt at the time what Sauls had said. Beyond that, the district court did not just order the transcript amended. Instead, it tested its own recollection against the original transcript, the official court reporter's notes, and the audio backup.

[¶ 22] We will spend little time discussing the appellant's additional arguments that correction of the transcript violated the constitutional doctrine of the separation of powers or his constitutional right to the due process of law. As to the former, the appellant presents no cogent argument and no citation to supportive authority. As to the latter, the record reflects that the district court offered the appellant the opportunity to review the court reporter's notes and the audio backup,

and offered to hold a hearing on the issue of whether the transcript could or should be corrected, but the appellant declined those opportunities.

[¶ 23] There is one other matter involved in this issue that we will mention, but not resolve. In his brief, the appellant contends that the district court responded to the jury's complaint that it had been unable to hear Sauls' testimony by having the court reporter read the testimony for the jury. Because the court reporter was reading, and was not reporting, the transcript does not reveal what was read back to the jury, and the tape is inaudible. However, the appellant argues that it is fair to assume that the reporter read back to the jury the version of the transcript that existed before it was corrected, meaning that the jury was told that Sauls did not mention methamphetamine. The fundamental problem with this argument is that the record says not that Sauls' testimony was read back to the jury, but that a "particular question and answer" were read back for the jury. Inasmuch as we do not know what that question was, or what the answer was, there is no way that we can evaluate the impact, if any, upon the present issue. Therefore, we decline to address it.

*Whether the district court abused its discretion by admitting evidence of the appellant's alleged use of methamphetamine?*

[¶ 24] Decisions regarding the admissibility of evidence are within the sound discretion of the trial court. We afford considerable deference to the trial court's rulings and will uphold them if we find they have a legitimate basis. On review, our primary consideration is the reasonableness of the trial court's decision. If we conclude the trial court erred in admitting evidence, we then must determine if the error was prejudicial, requiring reversal, or whether it was harmless. An error is prejudicial if there is a reasonable possibility the verdict might have been more favorable to the appellant if the error had never occurred. The burden of proving prejudicial error rests with the appellant.

*Callen v. State*, 2008 WY 107, ¶ 5, 192 P.3d 137, 141 (Wyo.2008) (citations omitted). We have defined reasonableness in this context as "sound judgment exercised with regard to what is right under the circumstances and without being arbitrary or capricious." *Smith v. State*, 2009 WY 2, ¶ 35, 199 P.3d 1052, 1063 (Wyo.2009) (quoting *Szymanski v. State*, 2007 WY 139, ¶ 15, 166 P.3d 879, 883 (Wyo.2007)).

[¶ 25] Although not fully treated as a separate issue, the appellant raises as part of this argument the district court's denial of his mid-trial motion for a mistrial, based upon admission of this evidence. The denial of a motion for a mistrial is also reviewed for an abuse of discretion. *Drury v. State*, 2008 WY 130, ¶ 8, 194 P.3d 1017, 1019 (Wyo.2008). "Granting a mistrial is an extreme and drastic remedy that should be resorted to only in the face of an error so prejudicial that justice could not be served by proceeding with trial." *Id.* (quoting *Warner v. State*, 897 P.2d 472, 474 (Wyo.1995)). The appellant has the burden of proving such prejudice. *Id.*

[¶ 26] This issue can only be understood in the context of the year-long pretrial wrangling over the admissibility of evidence that the appellant used methamphetamine. Such evidence is what is known as "uncharged misconduct evidence," and its admissibility is governed by W.R.E. 404(b):

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

[¶ 27] We have well-established procedures for trial courts to follow in determining the admissibility of evidence under W.R.E. 404(b). First, they are to determine (1) whether the evidence is offered for a proper purpose; (2) whether the evidence is relevant; and (3) whether the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice. *Barker v. State*, 2006 WY 104, ¶ 35, 141 P.3d 106, 118 (Wyo.2006). Upon request, the trial court must instruct the jury that the evidence is to be considered only for the purpose for which it was admitted. *Id.* The record also must "reflect the trial court's identification of the purpose or purposes for admission of the evidence, the findings and conclusions establishing relevance and probative value, and the factors considered in balancing probative value against the potential for unfair prejudice." *Leyva v. State*, 2007 WY 136, ¶ 31, 165 P.3d 446, 455 (Wyo.2007) (quoting *Gleason v. State*, 2002 WY 161, ¶ 30, 57 P.3d 332, 343 (Wyo.2002)). Uncharged misconduct evidence that is "intrinsic" to the facts surrounding the crime is not thereby insulated from analysis under W.R.E. 404(b). *Reay v. State*, 2008 WY 13, ¶ 11, 176 P.3d 647, 651 (Wyo.2008); *Leyva*, 2007 WY 136, ¶ 23, 165 P.3d at 453. And finally, an appellant's filing of a pretrial demand for notice of the State's intent to introduce evidence under W.R.E. 404(b) shall be treated as a timely objection to the admission of such evidence. *Howard v. State*, 2002 WY 40, ¶ 23, 42 P.3d 483, 491 (Wyo.2002).

[¶ 28] With those rules in mind, we will look at what happened in this case. On June 11, 2007, the appellant filed a discovery motion that contained a demand for notice of W.R.E. 404(b) evidence. Ten days later, based upon the stipulation of the parties, an order was entered requiring the giving of such notice. On September 14, 2007, the State filed its notice of intent to introduce evidence under W.R.E. 404(b), including, among other things, evidence that, upon his return from Colorado in 2006, the appellant's personality had changed, in that he became explosive and violent, probably from the use of methamphetamine.

[¶ 29] This notice of intent was followed by a second notice, filed September 26, 2007, indicating that the State intended to offer evidence of drug analysis that revealed the

presence of marijuana and methamphetamine in the appellant's blood and urine. On that same day, the State filed its notice of intent to introduce the testimony of a witness who was smoking marijuana with the appellant "only hours before" the shooting. These notices were followed by the appellant's motion to strike all of the evidence, alleging that it was not properly supported by legal analysis.

[¶ 30] On October 2, 2007, the appellant filed a motion *in limine* specifically contesting the introduction of evidence concerning the blood and urine tests for amphetamine, the witness testimony concerning his use of marijuana, and the chemical tests revealing his blood alcohol content. The motion pointed out the inconsistencies in the blood and urine tests, and questioned the relevance of the marijuana and alcohol evidence to an allegation of second-degree murder. On October 4, 2007, the State filed a response to both the motion to strike and the motion *in limine*. After soundly berating this Court for its opinion in *Leyva*, 2007 WY 136, ¶ 23, 165 P.3d at 453, wherein we held that "intrinsic" uncharged misconduct evidence was subject to analysis under W.R.E. 404(b), the State argued that the appellant's historic drug use, psychological problems, and recklessness with guns were relevant to his state of mind at the time of the shooting, which is an element of the crime charged. In addition, the State contended that evidence of the appellant's drug and alcohol use at the time of the shooting, as well as his shooting in the direction of Munson, were admissible under the theory alternatively known as *res gestae*, course of conduct, same transaction, complete story, history of the event, context, or enhancing the natural development of the facts. In another response filed one day later, the State notified the district court that the blood sample had been submitted to AIT for confirmation testing, and repeated its arguments as to the deficiencies of *Leyva* and the admissibility of the alcohol, marijuana, and methamphetamine evidence as history of the event, or enhancing the natural development of the facts, course of conduct, or same transaction, or complete story evidence.[3]

[¶ 31] The appellant replied to the State's responses on October 9, 2007, generally contesting not only the validity of the drug and alcohol evidence, but also its relevancy in a second-degree murder prosecution. All pretrial motions, including the ones involving uncharged misconduct evidence, were heard on October 9 and 11, 2007. The district court characterized that portion of the hearing as "a *Gleason* hearing under 404(b)."[4] The State called six witnesses, with their testimony focusing on the appellant's alcohol and drug history, a recent change in his personality toward hatred and violence, and recklessness with firearms. The district court and counsel agreed that the parties' closing arguments would be submitted in writing.

[¶ 32] The State's closing argument was filed on October 26, 2007, with its position outlined in this brief sentence:

> Evidence of [the appellant's] use of illegal controlled substances, his propensity to lose his temper and fly into angry rages, his reckless and negligent use of firearms, and statements made by him of his intent to cause others serious bodily harm and/or death, is offered to show the following: 1) [The appellant's] State of Mind at the Time of Alleged Murder; 2) Lack of Mistake or Accident; 3) Motive and malice; and 4) Course of conduct.

This outline is fleshed out with the following arguments: to find the state of mind of "purposely and maliciously," the jury will need to be aware of the appellant's history of drug use and the fact that the appellant was using drugs and alcohol at the time of the shooting; to find that the shooting was not

---

**3.** We caution the State's prosecutors and trial judges that utterance of phrases such as "course of conduct" and "enhancing the natural development of the facts" is not a substitute for thoughtful analysis of intrinsic uncharged misconduct evidence. That was the point made in *Leyva* and *Reay*.

**4.** In *Gleason*, 2002 WY 161, ¶¶ 17–33, 57 P.3d at 339–44, we reviewed W.R.E. 404(b), and then set forth in detail the procedures we expected trial courts to follow in analyzing uncharged misconduct evidence under the Rule, and further set forth what we expected to appear in the record revealing that analysis.

an accident, the jury will need to be aware of the appellant's history of recklessness with firearms; to find motive and malice, the jury will need to be aware of the appellant's changed personality and his repeated threats of violence toward others; and, to understand the appellant's course of conduct and to get a complete picture, the jury will need to be aware of the appellant's drug use, his propensity for violence, his recklessness with firearms, and his threats of violence toward others. Finally, the State argued that all of the evidence was clearly probative of the facts noted, and that it was more probative than prejudicial.

[¶ 33] The appellant's closing argument, in the form of another motion *in limine*, was filed on November 6, 2007. The motion is quite lengthy, because the appellant analyzed in detail many different pieces of proposed evidence. He did not object to the testimony of the witness who saw the appellant drinking alcohol and smoking marijuana prior to the shooting. He did, however, object to the proposed testimony of the same witness that, in the past, she used methamphetamine or cocaine with the appellant, on the ground that the latter testimony was highly prejudicial, while probative of nothing. He also argued that evidence of past instances where he may have become angry or threatened violence simply did not prove that he shot Voss in a methamphetamine-induced rage, rather than by accident, and are exactly the type of prejudicial character evidence that W.R.E. 404(b) is meant to keep from the jury.

[¶ 34] The district court issued a decision letter on November 21, 2007, in which, among other things, it addressed the uncharged misconduct issues raised by the appellant. Strictly following our *Gleason* requirements, the district court separately analyzed each piece of evidence proffered by the State under W.R.E. 404(b), finding some to be admissible, and some to be inadmissible. In relevant part, the district court made the following rulings, as clarified by a later order:

1. The witness's testimony about previous drug use with the appellant was not admissible to prove the appellant's mental state at the time of the killing because the evidence was too remote and tenuous, meaning it did not fall within the course of conduct purpose. Furthermore, the inference that prior drug use somehow proved the malice element of second-degree murder was an improper inference.

2. The blood and urine tests with contradictory results for the presence of methamphetamine were not admissible.[5]

[¶ 35] It is in this context that we will examine what happened at trial, and the appellant's complaints in regard thereto. During his opening statement, the prosecutor quoted the anticipated testimony of Mr. Sauls that the appellant "indicated that he had indeed killed Mr. Voss, and the reason for it was he was coming down from drugs." This statement resulted in defense counsel's motion for a mistrial. In arguing the motion, defense counsel essentially contended that admission of Sauls' statement would reverse the district court's prior rulings denying admission of any methamphetamine evidence. In addition, the appellant would not be able to impeach Sauls on the basis of the negative AIT test results, because Dr. Evans now claimed that those results were not trustworthy. As mentioned earlier herein, the State then proceeded to argue for admission of Sauls' rendition of the appellant's statement, not under W.R.E. 404(b), but as an admission by a party opponent, presumably under W.R.E. 801(d)(2).[6] *See supra* ¶¶ 10–11. Also as indicated above, the district court then ruled that Sauls' testimony was admissible, and that the appellant could impeach

---

5. Confusion over whether it was the intent of the decision letter and original order to deny introduction of only the presumptively negative urine test, or both the blood and urine tests, resulted in a clarifying order keeping both out of evidence.

6. W.R.E. 801(d) reads in pertinent part as follows:

(d) *Statements which are not hearsay.*—A statement is not hearsay if:

. . . .

(2) Admission by Party–Opponent.—The statement is offered against a party and is (A) his own statement. . . .

that testimony via Dr. Evans. *See supra* ¶ 12.

[¶ 36] Subsequently, Sauls testified about his jailhouse conversation with the appellant, with the most significant portion of that testimony being that the appellant said he "was all methed out" at the time of the shooting. After several intervening witnesses, the State called Dr. Evans to the stand. During his direct examination, Dr. Evans made no mention of the AIT test results involving the appellant, but testified instead at considerable length about methamphetamine—its use, its effects (during use and during withdrawal from use), and how its presence is detected by chemical testing. Defense counsel twice objected and moved for a mistrial during the direct examination, with both motions being denied. Only during cross-examination did Dr. Evans testify that the appellant's blood sample tested negative for the presence of methamphetamine. During redirect examination, Dr. Evans testified that a normal dose of methamphetamine would be undetectable under standard testing if 22 to 40 hours had passed between the time of use and the time of testing.

[¶ 37] The prosecutor made use of this methamphetamine testimony in his closing argument. First, in suggesting that there were several versions of the shooting incident, he commented as follows:

> The second story is a story that [the appellant] gives while he is in jail. It's a story he tells his bunkmate, how methamphetamine has taken over his life, how methamphetamine is the reason he killed his friend, Jason Voss.

Later in his closing, using words more like those used by Sauls, the prosecutor repeated what Sauls said the appellant had told him:

> He said that he shot his friend. He didn't know why he did it. He was all drugged up at the time. And then I think [Sauls] turned to the jury and said I think the exact words were, I was all meth'd out. And then he said those words came from his mouth.

[¶ 38] Finally, the prosecutor emphasized the purported role of methamphetamine in the shooting by reminding the jury of Dr. Evans' testimony:

> Dr. Evans talked about methamphetamine. He talked about the life of methamphetamine being a drug which remains just a short time in the body, about 30 to 40 hours. The problem with methamphetamine is not when it's in your system; it's when it's going out of your system. And I think it's a fair characterization to say that Dr. Evans said it's a drug that can suck whatever is good out of a person and replace it with torment, anger, hostility, and anxiety. And then I want you to think about the confession that [the appellant] made to his roommate in jail when he said he was spinning out on meth.

[¶ 39] Finally, we will note that defense counsel impeached the State's methamphetamine evidence by questioning Dr. Evans as to the negative test results, and with two crucial observations during closing argument: first, that no witness testified the appellant had used methamphetamine in the days leading up to the shooting incident, and second, that the appellant's blood sample tested negative for the presence of methamphetamine.

[¶ 40] We conclude that the district court did not abuse its discretion in admitting the testimony of Sauls and Evans. Our first observation is that admission of this evidence did not violate the district court's prior rulings governing uncharged misconduct evidence. Sauls was a newly discovered witness, upon whose testimony the court had not previously ruled, and about whom defense counsel was timely notified. Moreover, the district court gave defense counsel an opportunity to request a hearing if one was necessary in regard to Sauls' testimony. Defense counsel made no such request, and did not request a continuance of the trial.[7]

[¶ 41] The appellant's statements to Sauls were clearly admissions by a party opponent under W.R.E. 801(d)(2), and were, therefore,

---

7. The appellant did, on the first day of trial, file a motion *in limine* asking the district court to preclude Sauls from testifying. The motion, which complained largely of Sauls' questionable credibility because he was a "jailhouse snitch," was not heard before the prosecutor's mention of Sauls during his opening statement resulted in defense counsel's first motion for a mistrial.

not hearsay. While they also may have related to uncharged misconduct, they were relevant to prove the appellant's state of mind at the time of the shooting, they were more probative of his state of mind than any other available evidence, and they were not unduly prejudicial. Even without the methamphetamine evidence, there was sufficient evidence presented for the jury to have found the appellant guilty beyond a reasonable doubt of involuntary manslaughter, the basis for which lies in reckless behavior (marijuana use, alcohol consumption, and unsafe firearms practices such as the indiscriminate firing of a firearm in the vicinity of others, and pointing a loaded firearm at others).

[¶ 42] Once Sauls testified about the appellant's admission that he was "methed out" at the time of the shooting, the foundation was laid for Evans' testimony about the effects of methamphetamine use. Defense counsel's impeachment of Evans, including the negative chemical test results and the lack of any other testimony about methamphetamine use, properly went to the weight to be given Evans' testimony, not its admissibility. One oddity about this case is that the State's own closing argument, including its attention to controlled substance use, appears to have been intended to encourage the jury to find the appellant guilty of reckless conduct (manslaughter), rather than purposeful and malicious conduct (second-degree murder). Thus, the State's own arguments contributed to the lack of prejudice resulting from the methamphetamine evidence. Furthermore, the jury appears to have rejected Evans' testimony that methamphetamine withdrawal causes anxiety, anger, irritation, irritability, and aggressive behavior, characterized by "a paranoid-schizophrenic type of approach" and "get[ting] into fights," because the jury rejected the charge of second-degree murder, which requires malice (hatred, ill will, hostility toward another—a wicked condition of mind), and found the appellant guilty only of manslaughter.

### Whether Wyoming's second-degree murder statute is facially unconstitutional?

██  ██  In the district court, the appellant filed a motion alleging the second-degree murder statute to be facially unconstitutional. He now appeals the denial of that motion. Because the appellant was acquitted of second-degree murder, however, we find the issue to be moot and we decline to address it. See State v. Blinzler, 183 Mont. 300, 599 P.2d 349, 352 (1979); People v. Webb, 189 Colo. 400, 542 P.2d 77, 78–79 (1975); 5 Am.Jur.2d Appellate Review §§ 596–99 (2007). As we have noted previously, "[a] court should not hear a case where there has been a change in circumstances occurring either before or after a case has been filed that eliminates the controversy." Merchant v. State Dep't of Corr., 2007 WY 159, ¶ 15, 168 P.3d 856, 862–63 (Wyo.2007) (quoting KO v. LDH (In re Guardianship of MEO ), 2006 WY 87, ¶ 27, 138 P.3d 1145, 1153 (Wyo.2006)). Because of the constitutional double jeopardy protections, one such change in circumstances is an acquittal in a criminal case. Phillips v. State, 835 P.2d 1062, 1066 (Wyo.1992); Eatherton v. State, 761 P.2d 91, 94 (Wyo.1988). A decision that can have no effect upon the parties before the court is nothing but an advisory opinion.

### CONCLUSION

[¶ 44] There is no suggestion that the district court intentionally falsified the case record, and the appellant has failed to prove that the district court acted unreasonably in ordering the trial transcript to be amended. All available information indicates that the transcript was made to comport with the actual testimony. The appellant has also failed to prove that the district court abused its discretion in admitting the testimony of Sauls about the appellant's jailhouse confession, or the testimony of Evans as to methamphetamine. Sauls' testimony was admissible as a non-hearsay admission by a party opponent, it was directly relevant to the appellant's state of mind at the time of the crime, it was probative as to the appellant's state of mind, and it was reasonable for the district court to find it more probative than unfairly prejudicial. Furthermore, once the appellant's admission of methamphetamine use was admitted, there existed a foundation for Evans' testimony about methamphetamine use. Finally, the appellant's argument

that Wyoming's second-degree murder statute is unconstitutional was rendered moot when the jury acquitted him of that charge.

[¶ 45]   We affirm.